# NO. 23-1731

In The

# United States Court Of Appeals
## For The Fourth Circuit

**MICHAEL A. SCOTT; RUDOLPH ARMSTRONG; AARON KESSLER; MARK MARINER; LAMAR MARTIN; JEFFREY WELSHONS; DESHAWN PENHA; AARON SILWONUK; ADAM DULAJ; ASZMAR HINES; GREGORY MALICKI; JASON HADEL; MICHAEL WELLS; VINCENT STONE; TONY BLACK; DONNELL FOSTER, JR.; KENNETH NIERWIENSKI, JR.; CHRISTOPHER HACKLEY; EDWARD PENDERGAST; SAIQUON WHITE; JOE MCDANIELS; ESPINAL OSVALDO; YUSEF OSIRUPHU-EL; TAVIST JAMES; DAKOTA BARNARD; MAURICE RICHARDSON; SHAWN BROOKS; RAYNARD STANCIL; JAMES PEACE; CLINTON REAGAN; MATTHEW BAHR; RICHARD LEWIS; KENNETH LUCKEY, JR.; PERRY SENIOR; LAWRENCE ANDERSON; MARK GANTT; RASHAD MILLS; LANDON BUTLER; JEREMY OGAS; GREGORY BLAIR; DAVAUGHN CROSBY; CHRIS VELTE; MATTHEW CARSON; HAROLD SNYDER; BRANDON BUCKMASTER; WILLIAM MOROME; THOMAS WILLIAMS; JOSEPH DAWSON; KEVIN COOPER; DAMIEN WATERS; MATTHEW BERMAN; DUSTIN MOHR,**

*Plaintiffs – Appellants,*

v.

**BALTIMORE COUNTY, MARYLAND,**

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

————————————

## BRIEF OF APPELLANTS

————————————

**Howard B. Hoffman**
**Jordan Song En Liew**
**HOFFMAN EMPLOYMENT LAW, LLC**
**600 Jefferson Plaza, Suite 204**
**Rockville, MD 20852**
**(301) 251-3752**

*Counsel for Appellants*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1731            Caption: Scott et al. v. Baltimore County, Maryland

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michael Scott, et al.
(name of party/amicus)

_____

who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____07/12/2023_____

Counsel for: Appellants, Michael Scott, et al.

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES.................................................................... iii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF CASE ..........................................................................2

    I.    The Incarcerated Workers Were Loaned Out By County Corrections To The County's DPW.................................................2

    II.   Incarcerated Persons Performed The Same Sorting Work As "Temps."...........................................................................................5

    III.  The Predominate Purpose Of The Work Was Economic. ...................6

    IV.  The Work Performed Was Voluntary....................................................11

    V.    Inmate Pay And Excessive Hours of Work .........................................12

    VI.  Bargaining By MRF Detail Workers...................................................14

    VII.  DPW Controlled MRF Detail Workers ............................................16

    VIII. The "Quota" Of MRF Detail Workers Was The County's Priority .......17

SUMMARY OF ARGUMENT................................................................21

ARGUMENT ..........................................................................................23

    I.    Standard of Review ..........................................................................25

    II.   The District Court Erred As A Matter Of Law In Ruling The MRF Detail Workers Were Not Employees Under The FLSA ..........27

        a.    *Harker* Is Confined To Prison Training Or "Prison Housework." ...................................................................27

        b.    The MRF Work Detail Must Be Viewed Using An "Economic Realities" Test, Taking Into Account The "Totality Of Circumstances."...................................................32

i

c.    The Economic Realities, As Measured By The "Totality of The Circumstances," Clearly Demonstrate The MRF Detail Workers Were Covered Employees................................37

    i.    The Primary Purpose Of The Work Was Economic .......37

    ii.    The MRF Detail Workers Were Involved In The National Economy ..........................................................39

    iii.    The MRF Detail Work Was Voluntary............................40

    iv.    DOC Asserted *Too Little Control* Over The Putative Employment Relationship .................................40

    v.    The Purposes Of the FLSA Are Served By Extending FLSA Coverage To The MRF Detail Workers .............................................................................42

    vi.    MRF Detail Workers Were Paid From The DPW Budget.............................................................................48

    vii.    This Case Presents The "Extraordinary Circumstances" Warranting FLSA Coverage ................49

III.    Even If The District Court Applied The Appropriate Test, The District Court Nevertheless Erred By Deciding Disputed Issues of Material Fact And Admitting Inadmissible Evidence.....................51

    a.    If The District Court Applied *Harker*, It Still Improperly Decided Disputed Issues of Fact................................................51

    i.    The Purpose Was To Turn A Profit .................................51

    ii.    There Existed A Bargained-For-Exchange .....................54

    iii.    The Incarcerees Worked To Maintain Minimum Standards.........................................................................55

CONCLUSION ...................................................................................................56

STATEMENT ON ORAL ARGUMENT.................................................................56

CERTIFICATE OF COMPLIANCE.......................................................................57

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*,
   856 F. App'x 445 (4th Cir. 2021)..................................................31, 34, 35, 37

*Asplundh Mfg. Div., a Div. of Asplundh Tree
Expert Co. v. Benton Harbor Engineering*,
   57 F.3d 1190 (3rd Cir. 1995)..........................................................................52

*Ballengee v. CBS Broad., Inc.*,
   968 F.3d 344 (4th Cir. 2020)..........................................................................26

*Benshoff v. City of Virginia Beach*,
   9 F. Supp. 2d 610 (E.D. Va. 1998), *aff'd*,
   180 F.3d 136 (4th Cir. 1999)..........................................................................43

*Brock v. Mr. W Fireworks, Inc.*,
   814 F.2d 1042 (5th Cir. 1987)........................................................................26

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988).........................................................................35

*Burrell v. Staff*,
   60 F.4th 25 (3d Cir. 2023)......................................................................*passim*

*Calderon v. GEICO Gen. Ins. Co.*,
   809 F.3d 111 (4th Cir. 2015)..........................................................................42

*Carter v. Dutchess Community College*,
   735 F.2d 8 (2d Cir. 1984)...............................................................................49

*Cleveland Cnty. v. Conner*,
   143 S. Ct. 523, 214 L. Ed. 2d 300 (2022).....................................................42

*Conner v. Cleveland Cnty., N. Carolina*,
   22 F.4th 412 (4th Cir. 2022)..........................................................................42

*Franklin v. City of Charlotte*,
   64 F.4th 519 (4th Cir. 2023)..........................................................................54

*Goldberg v. Whittaker House Coop., Inc.*,
    366 U.S. 28 (1961)........................................................................35

*Harbourt v. PPE Casino Resorts Maryland, LLC*,
    820 F.3d 655 (4th Cir. 2016)......................................................37

*Harker v. State Use Indus.*,
    990 F.2d 131 (4th Cir. 1993)................................................*passim*

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
    598 U.S. 39, 143 S. Ct. 677 (2023) ...........................................29

*Hensley ex rel. North Carolina v. Price*,
    876 F.3d 573 (4th Cir. 2017)......................................................54

*Henthorn v. Dep't of Navy*,
    29 F.3d 682 (D.C. Cir. 1994) ...............................................36, 40

*Icicle Seafoods, Inc. v. Worthington*,
    475 U.S. 709 (1986)...................................................................25

*Jewell Ridge Coal Corp. v. Mine Workers*,
    325 U.S. 161 (1945)...................................................................29

*Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*,
    36 F.3d 8 (4th Cir. 1994)...........................................................32

*King v. Schrader*,
    No. CV DKC 16-3804, 2017 WL 3730335 (D. Md. Aug. 30, 2017)............55

*Lackawanna Recycling Ctr., Inc. v. Burrell*,
    143 S. Ct. 2662 (2023).........................................................23, 24

*Matherly v. Andrews, et al.*,
    859 F.3d 264 (4th Cir. 2017)...............................................*passim*

*McFeeley v. Jackson St. Ent., LLC*,
    825 F.3d 235 (4th Cir. 2016).........................................33, 34, 35

*Mitchell v. Robert DeMario Jewelry, Inc.*,
    361 U.S. 288 (1960)...................................................................45

*Morrison v. Int'l Programs Consortium, Inc.*,
    253 F.3d 5 (D.C. Cir. 2001) ...........................................................26

*Ndambi et al. v. CoreCivic, Inc.*,
    990 F.3d 369 (4th Cir. 2021)................................................*passim*

*Purdham v. Fairfax Cnty. Sch. Bd.*,
    637 F.3d 421 (4th Cir. 2011).........................................................34

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947)...............................................................35, 36

*Salinas v. Com. Interiors, Inc.*,
    848 F.3d 125 (4th Cir. 2017)....................................................33, 35

*Schultz v. Cap. Int'l Sec., Inc.*,
    466 F.3d 298 (4th Cir. 2006)..................................... 25-26, 34, 36

*Steelman v. Hirsch*,
    473 F.3d 124 (4th Cir. 2007)...............................................35, 36, 42

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985)...................................................................42

*Torcasio v. Murray*,
    57 F.3d 1340 (4th Cir. 1995).........................................................31

*U.S. ex rel. El-Amin v. George Washington Univ.*,
    533 F. Supp. 2d 12 (D.D.C. 2008) ..............................................53

*Vanskike v. Peters*,
    974 F.2d 806 (7th Cir. 1992)................................................*passim*

*Villarreal v. Woodham*,
    113 F.3d 202 (11th Cir. 1997).......................................................36

*Wai Man Tom v. Hosp. Ventures LLC*,
    980 F.3d 1027 (4th Cir. 2020).......................................................26

*Walling v. Helmerich & Payne, Inc.*,
    323 U.S. 37 (1944).......................................................................43

*Watson v. Graves,*
    909 F.2d 1549 (5th Cir. 1990)..............................................................49, 51, 55

*Wilson v. Volkswagen of America, Inc.,*
    561 F.2d 494 (4th Cir. 1977)............................................................53

**Statutes:**

28 U.S.C. § 1331 ............................................................................................1

28 U.S.C. § 1367 ............................................................................................1

29 U.S.C. § 202(a) ...............................................................................39, 46

29 U.S.C. § 206 ........................................................................................*passim*

29 U.S.C. § 207 ........................................................................................*passim*

Md. Code, Lab. & Empl. § 3-401, *et seq.* ..........................................1, 2

**Rules:**

Fed. R. App. P. 4(a)(1)(A) ..........................................................................1

Fed. R. Civ. P. 30(b)(6) ............................................................................53

**Other Authorities:**

*Employment Law – Fair Labor Standards Act – Fourth Circuit Holds that*
*Detained Immigrant Workers Are Not "Employees" Under The*
*Federal Labor Standards Act. – Ndambi v. CoreCivic, Inc.,*
    990 F.3d 369 (4th Cir. 2021),
    135 Harv. L. Rev. 1512 (Mar. 2022).................................................45, 46, 47

Hauptman, *The Health and Safety of Incarcerated Workers:*
*OSHA's Applicability In The Prison Context,*
    37 Lab. Lawyer 1 (2023) ..............................................................47

Whitehouse, *Modern Prison Labor: A Reemergence of Convict Leasing*
*Under the Guise of Rehabilitation and Private Enterprises,*
    18 Loy. J. Pub. Int. L 89 (2017)....................................................48

vi

## JURISDICTIONAL STATEMENT

Michael Scott ("Scott"), on behalf of himself and other incarcerated workers, filed this action against Baltimore County, Maryland ("County") in the U.S. District Court for the District of Maryland, raising claims under the Fair Labor Standards Act, 29 U.S.C. §§ 206 and 207 ("FLSA") and the Maryland Wage/Hour Law, Md. Ann. LE art. 3-401 *et seq.* ("MWHL"). (JA39). The District Court had jurisdiction under 28 U.S.C. § 1331 and 1367.

This is an appeal from a final judgment of the District Court disposing of all parties' claims with prejudice, entered on June 9, 2023. (JA1841). Scott's Notice of Appeal was filed on July 7, 2023, within 30 days, as required by Rule 4(a)(1)(A), Fed. R. App. P. (JA1842). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether incarcerated workers are "employees" under the FLSA, given the "economic realities" and taking into account the "totality of the circumstances" of the work, when the work was voluntary, involved sorting recyclable materials outside of a prison, was paid by a non-corrections entity who made millions of dollars off the labor of the incarcerated workers, and the labor was performed in the same means and manner as non-incarcerated workers, who competed for jobs against the incarcerated labor pool.

## STATEMENT OF CASE

On January 5, 2021, Scott filed this FLSA lawsuit against the County. (JA39). Scott alleged that he and other workers incarcerated in Baltimore County's Detention Center ("BCDC") were denied the protections of the FLSA when they voluntarily worked in Baltimore County's Material Recovery Facility ("MRF") operated by the County's DPW. The case proceeded as both an FLSA collective action and a Rule 23 class action under the MWHL. On June 9, 2023, the District Court entered Summary Judgment in favor of the County, holding the incarcerated workers were not "employees" covered by the FLSA. (JA1805, JA1841). This timely appeal followed.

### I.    The Incarcerated Workers Were Loaned Out By County Corrections To The County's DPW.

The County's Executive Branch consists of separate government agencies, (JA537), led by different agency heads, who report to the County Administrator.[1] (JA539). Pertinent to this lawsuit are three agencies: the Department of Corrections ("DOC"); the DPW; and the Office of Information and Technology ("OIT"), and within the OIT, there is a work group known as "Operational Excellence" ("OpEx").

DOC oversees the BCDC, where Scott and others were incarcerated, typically for short sentences. (JA700-702). DOC's warden was Gail Watts ("Watts").

---

[1]    For most of the time pertinent to this lawsuit, the County Administrator was Frederick Homan ("Homan"). (JA751-752).

DPW is responsible for picking up, sorting, baling, and selling recyclable waste materials. (JA464). This activity occurs at the County's Central Acceptance Facility ("CAF") which contains the "Material Recovery Facility" ("MRF").[2] For all times pertinent, John Jones ("Jones") was the Plant Manager of the MRF, Willie Bruce ("Bruce") was the Operations Manager, and there were three supervisors in sorting. (JA368-370, JA373). One of those supervisors was Anthony Robinson ("Robinson"). (JA760). The MRF was generally operated by DPW's Bureau of Solid Waste ("BSW"), whose Chief was Michael Beichler ("Beichler"). (JA612, JA618). Beichler was removed from supervising the MRF and was replaced by Robert Burke ("Burke"), a leading member of OpEx.[3] (JA524); (JA671-672, JA675-676, JA681-682). Importantly, Beichler, Jones, Bruce, Robinson (and other DPW supervisory staff at the MRF) and Burke are neither supervised, controlled, nor report to the DOC. (JA619-621, JA677-679); (JA543). Similarly, DPW and BSW are not part of the DOC.

---

[2]    Although they are technically different (the MRF is within CAF), CAF and MRF are used synonymously by witnesses and are used synonymously herein.

[3]    OpEx's mission with MRF was to "[u]pdate and improve County recycling operations to optimize revenue generated by the sale of [SSR] products. Improve asset management processes and implement cost controls. Improve product bid/sales process. Develop management metrics to better manage and monitor overall operations. Analyze staffing needs and updated organizational structure to improve production efficiency." (JA872-873).

Within the DOC, there is a "Community Corrections Program" ("CCP"). Incarcerated persons participating in this program are housed separately from general population. (JA703-704;) (JA1101). CCP oversees "work release" and "work detail" programs. (JA708). One purpose of the program was to allow sentenced incarcerees to be able to "provide for the family" and "deal with any court obligations." (JA1210).

There are many work details typically involving traditional "prison housework," such as working in the kitchen, the commissary, and cleaning laundry. (JA1109, JA1110, JA1115). However, CCP only administered work details that relate to work *outside* of BCDC's facility. (JA1120-1121).

One such work detail involved performing labor at the MRF, sorting trash from recycling and sorting the different types of recyclable materials.

The MRF sorts and bales scrap metals, papers, and plastics. (JA617). This waste material arrives in a combined (mixed) state and is placed on a conveyor sorting system referred to as a "single stream recovery" ("SSR"). (JA355-364). Materials can be wet, dirty, and messy. (JA758-759, JA772-773); (JA428-429); (JA625). Contamination reduces value. (JA624-625).

Materials are sorted by machine and human sorter. (JA355-364). Each sorted commodity has a specific market value. (JA616). Once sorted, materials are baled together. (JA365-367). Sales price is determined by quality and market conditions.

(JA641); (JA478).  Better quality results in better price. (JA378); (JA490-491).

Naturally, DOC does not use these materials.  (JA480).  Bales of recyclables are

auctioned off to commodity purchasers. (JA479).

## II.  Incarcerated Persons Performed The Same Sorting Work As "Temps."

Human sorting was done by incarcerees confined at the DOC <u>and</u> non-

incarcerated "temps," who are paid the full minimum wage by "temp agencies."

(JA424); (JA786); (JA919); (JA920-922); (JA994).  Temps performed "the same

work" as incarcerees, (JA375), and both incarcerees and temps were supervised by

DPW supervisors, one of whom was Robinson.  (JA685); (JA786, JA821).[4]  Temps

were used to fill labor shortfall from incarcerees.  (JA1050); (JA1018).  Incarcerees

workers and temp workers are located next to each other on an organizational chart.

(JA486); (JA1679).  Temps are also told, like incarcerees, not to scavenge for items

on the line.  (JA396).  Both had "lead" persons on their team, but the DOC worker

lead was not an official designation.  (JA788).  Temps worked in two separate shifts

and the incarcerees in one excessively long shift.  (JA651-652).  Neither incarcerees

nor temps were trained on heavy equipment, like forklifts or front-end loaders.

(JA423).  Incarcerees and temps got the same break time.  (JA454-456).  DPW

regulated the attendance of temps and incarcerees in the same way (sign-in sheet).

(JA389-391).

---

[4]     *See also* (JA524-525); (JA975).

Temps worked less hours and when they left for the day, the incarcerees would replace the temps at their work location. (JA437-438); (JA1024). Naturally, using temp labor was more expensive than using incarcerees and the District Court correctly assessed that cost reduction was the goal of employing prisoners. (JA1829); (JA647-648) (referring to the "sweet spot"); (JA923-938) (comparing costs of incarcerated workers to temps). Incarcerees were used to replace the need for temp labor, (JA440-441); (JA967), as temp labor resulted in the County making less money off MRF operations. (JA649).

### III.    The Predominate Purpose Of The Work Was Economic.

The District Court correctly found that "the County operated the [MRF] as a business and benefited from using cheaper labor." (JA1829). It is <u>undisputed</u> that the work of incarcerees generated revenue, (JA463), based on sales of recyclables. (JA352-367). The MRF processes more than 85,000 tons of recyclables per year, including 24,000 tons Baltimore County obtained from Harford County. (JA528-529); (JA1680). Baltimore County received $41 million dollars from the sale of recyclables commodities, or $488,000.00 per month, from January 2014 through December 2020. (JA1830); (JA529). The former County Executive, Kevin Kamenetz, said the County was turning "$2 million a year in profit" and turning "trash into cash." (JA569); (JA1681). Beichler proclaimed that MRF recycling was a "business decision that makes economic efficiencies" operating in an

6

"entrepreneurial manner." (JA690-691); (JA1683-687). Matthew Carpenter, the County's chief of Budget and Administration, similarly agreed it was entrepreneurial because Baltimore County is selling commodities. (JA911-913).

In operating the MRF, the County used business terms such as "maximize revenue,"[5] "profit," "business" and "quotas." *See, e.g.* (JA862 ("Maintain position as market leader to maximize revenue"), JA877, JA878 (more consistent inmate numbers increases net revenue), JA879 ("CAF is a profitable County function."), JA880 (MRF purpose is to maximize revenues), JA882, JA883 (low attendance "not helping SSR operationally or financially"), JA884 ("The objective of both us and DPW is to bring in revenue.")); *see also* (JA766, JA804-805); (JA463, JA496-97).

There are private companies, like publicly traded Waste Management, which does exactly what the County was doing: sort and sell recyclable waste.[6] In not using Waste Management, the County sought to cut out the "middle person." (JA588-589).

The County prioritized maximizing revenue and minimizing expenses at the MRF. This was accomplished in a number of ways.

First, Homan terminated Maryland Environmental Service ("MES"), the long-time operating partner of the MRF (JA1051, JA1052-1053) and placed the MRF

---

[5]     The County's 30(b)(6) witness Carpenter admitted that maximizing revenue has been expressed as a goal by the County. (JA485).

[6]     Waste Management's systems are basically the same thing as the County's system, just larger. (JA417).

under OpEx. (JA671, JA681-82). Removing MES saved the County $800,000.00 annually. (JA575); (JA901). Once the County removed MES, there was an "enhanced effort" to make more money on the sales of recyclables, (JA499), and Homan was "very focused on the finances of [the] MRF" and the money it was generating (JA475, JA498). Once MES was terminated, Beichler was banned from the MRF and Burke from OpEx was put in charge. (JA671, JA673). Beichler testified that Homan wanted to run <u>two</u> shifts of incarcerees per day to increase production bringing in more material from <u>other</u> counties and that Homan "wanted to go bigger." (JA673-675). Homan wanted to remove temp laborers <u>entirely</u> and rely solely on inmates. (JA1054-1055) see also (JA514-515).

Under OpEx, hours were extended and "it was strictly business." (JA761-763). The County worked to optimize revenue generated by the sale of SSR products. (JA870-871; JA988-89, JA993). Robinson observed that working at the MRF was no different than any other industrial plant he had previously worked at. (JA757, JA765-766, JA810).

Second, the County maximized revenue by competing *against private waste companies*. The County obtained copies of Waste Management contracts with local jurisdictions. (JA1069-1076). The County feverishly worked on deals to accept recycling from Carroll County, Cecil County, Frederick County, York City/York County (PA), and Lancaster County (PA). (JA1071). Burke admitted that these

jurisdictions "would have brought a greater volume of material to the MRF" and "[t]he only reason that they would want greater volume would be to generate more revenue from recycling." (JA848-849). It is <u>undisputed</u> that the County processed the recyclable waste of Harford County and Cecil County, and the incarcerees handled these recyclables. (JA470-473, JA501-502).

The third step in maximizing revenue and minimizing expenses was to engage in marketing efforts, just like a private business. The County employed Richard Keller, a recognized expert in the recycling commodities marketplace, who serves as the "Recycling Marketing and Promotion Manager." (JA1077-1078). Keller ran the bid operations and was the marketer handling the bidding process. (JA479); (JA905); *see also* (JA1009-1010). The County engaged in "bale breaks" to show off quality. (JA490); (JA641). When commodity brokers saw the higher quality bales, the County commanded "higher prices than anywhere else … ." (JA641; see also JA578).

The fourth step in maximizing revenue was to prioritize the DOC supplied labor in order to increase production. (JA1017-1018). For example, Homan terminated a roadway cleanup work detail and transferred those incarcerees to the MRF. (JA631); (JA966).[7] The County's Deputy County Administrator (Donna

---

[7]    The County also transferred all the men off the animal shelter detail to the MRF detail. (JA1690)

Morrison) contacted Baltimore County's Circuit Court Administrative Judge to get criminal defendants to be *sentenced* to work at the MRF.  (JA1070) ("Donna contacted Judge Cox about sentencing offenders for community service to CAF – OpEx following up for status"); (JA840-843); (JA1057-1065).

Additionally, Homan put pressure on DOC to supply a certain number of incarcerees to the MRF.  (JA1263, JA1264-1266); (JA1290-1294).  DPW also pressured DOC.  (JA1267); (JA804-805).  The District Court correctly identified that there was a "quota," (JA1830), and the business model required DOC to provide a certain number of incarcerated persons to the MRF.  (JA1238-1239).  DPW sets the number and DOC worked to comply.[8]  (JA1255).  Furthermore, DPW pressured DOC not just on the number of incarcerees, but even their timeliness, with Jones sending Watts a letter dictating to her that inmates' work time would be extended due to any lost production time.  (JA1699)[9]  There was discussion of utilizing individuals on *home detention* to work at the MRF.  (JA1264); (JA874); (JA1295). The County even wanted *Baltimore City*, a neighboring jurisdiction, to supply the County MRF with incarcerated persons from *Baltimore City*.  (JA835-838);

---

[8]    Halligan first testified that there was no minimum number of inmates that DOC was required to provide and that the maximum number of inmates was 30. (JA1251-1253).  But after being impeached with a document, Halligan admitted that there was a 40-inmate quota.  (JA1254-1255); (JA1700-1701).

[9]    Jones testified he did not remember sending this letter but admitted that these were all issues and concerns he had raised previously with DOC and Watts. (JA1047-1049).

(JA1702).  The County admits that the inmate labor "quota" signified pressure to place inmates at the MRF.  (JA1016).  The District Court correctly observed that "[n]o evidence suggests that this inmate-labor quota existed to ensure the maximum number of inmates received the best possible rehabilitative training."  (JA1830).

## IV.   The Work Performed Was Voluntary.

The work performed at the MRF by incarcerated persons was optional and voluntary.  Incarcerated persons were not required to perform labor in a work detail. (JA744-745).  According to Phil Pokorny ("Pokorny"), former Supervisor of DOC's Community Corrections, incarcerees asked to work at the MRF detail.  (JA945). Incarcerees could resign from the work detail at any time.  (JA948).  Of course, incarcerees were not sentenced to work at the MRF, (JA1241) and were not required to work at the MRF.  (JA1234).  The decision to work at the MRF is left to the agreement of DOC and the incarcerated worker.  (JA1246).  Homan stated that incarcerated persons voluntarily exercised their free will and were "making the decision to work there[,]" (JA609-610), and "no one was made to work there." (JA560).  Burke thought the voluntary nature of the work was the problem with maintaining adequate staffing levels.  (JA995).  DOC did not just pick someone and say "[t]omorrow your going to MES, and if you don't do that, there's going to be some kind of sanction." (JA951-952).  Employment at the MRF would be terminated "if the inmate decided they did not want to work the CAF detail[.]" (JA1200-1201).

The County struggled to incentivize incarcerated persons to work at the MRF. (JA1079-1088); *see also* (JA1690-1696); (JA874-876); (JA519-520); (JA841); (JA1697).

If an incarcerated person asked to work, they were expected to work, (JA951-952), and if the incarcerated person declined to work <u>any</u> detail while in CCP, they were removed from this housing unit and returned to general population. (JA746); (JA1248-1249); (JA1130). None of the class members were ordered to work or threatened with sanction for failing to work. (JA1333); (JA1348); (JA1355).

## V.    Inmate Pay And Excessive Hours of Work.

All pay and incentives for the MRF work detail were paid from the DPW budget. (JA655); (JA906-907); (JA1228, JA1230-1231); (JA1173); (JA1692-1696). Indeed, DOC had no authority to increase the pay of MRF incarcerated workers. (JA1258). All other male DOC work details were paid *from the DOC budget*. (JA1229-1230); (JA1703). Incarcerated persons received diminution "industrial" credits for time working at the MRF but they could also receive diminution credits for simply good behavior or getting a GED. (JA283)

Unlike their counterpart "temps" who earned the minimum wage, (JA919), the incarcerated workers earned $20/day for working at the MRF. (JA825). This was the highest wage rate of any work detail, which Homan acknowledged was a reflection of "the willingness of individuals to work … it was supply and demand… . Fewer

12

inmates were interested in working at recycling so the stipend paid was higher at the recycling facility." (JA548); (JA519-520). Pay rates were based "upon feedback that they were getting from the inmates who were eligible to do that work." (JA550).

The County also provided an attendance bonus and production bonus. (JA864, JA1231, JA1412); (JA908); (JA657-1658); (JA1692-1693). There was also a "food incentive" (JA655-658); (JA1692-1693) to keep detail workers happy, motivated and productive. (JA655, JA657). The food incentive was based on bale production and was so successful "it allowed us … to bring in extra material from Harford County." (JA656); (JA910); (JA811-820); (JA862). The County used these forms of payment to incentivize MRF detail workers. *See* (JA1079-1088). DOC staff requested that DPW or MES provide incentives to increase incarceree labor participation, (JA1257), because DOC "can't force somebody to work so providing incentives would make them want to work the [MRF] detail." (JA1259).

Generally, work hours varied according to the flow of recyclables received. (JA650-651). Robinson testified that MRF detail workers would *arrive* at DPW at 6 am. (JA770). Evidence indicates MRF detail workers could work as late as 7:30 pm and not return to the Detention Center until 8:00 pm. (JA1704). MRF detail workers labored six days a week, (JA1158), but could also be required to work *seven* days per week at the MRF. (JA1196). The MRF detail was initially cancelled due to CV-19 but not resumed because of this litigation. (JA1325); (JA1705-1706).

## VI.    Bargaining By MRF Detail Workers.

Like employees in a manufacturing facility, the incarcerated workers at the MRF would seek to negotiate, even collectively, to improve conditions. *See* (JA1282); (JA1030) (Jones handled work stoppages); (JA942).    Incarcerees complained about working conditions, occasionally seeking resolution. *See* documents in (JA1332-1342); (JA1709-1710); (JA1712-1715).

The MRF was either "extremely cold or extremely hot." (JA780, JA824). According to Robinson, it was worse than working outdoors. (JA780, JA785). The cold would impact the number of incarcerees willing to perform work at the MRF. (JA1025). MRF detail workers were subjected to "extremely cold temperatures" and were in contact with metal surfaces with "not enough clothing on to protect themselves." (JA785). MRF detail workers would complain about the temperatures. (JA431).  MRF detail workers could have a family or friend bring them a coat (dropped off at DOC), (JA1175), or failing that, they might get a coat from DPW but Robinson admitted "they weren't adequate." (JA789). All DOC *might* do is hold a clothing drive (seeking donated items) and assign excess clothes left behind by other MRF detail workers (JA1274-1275), and was not concerned enough to purchase clothing from *its own budget*. (JA1287-1288).  Finding clothes was a struggle. (JA1328-1329). Beichler acknowledged that the DOC did not provide MRF detail workers with proper clothing to address the cold temperatures and that coats

14

provided by DPW had "fleas and lice" and "we had to wash them and care for them… ." (JA664-666). DPW provided "substandard" gloves, (JA771, JA790), which became wet resulting in complaints. (JA667; JA1289). Air quality was contaminated and poor, with no precaution taken over concerns like asbestos and toxic materials. (JA781-782); (JA669).

MRF detail workers complained about overflowing toilets and frozen porta-potties. (JA812); (JA1031-32); (JA1709-1710). Beichler recalled a collective work stoppage by MRF detail workers. (JA663). Jones handled work stoppages by MRF detail workers. (JA1030). MRF detail workers complained of harassment, including a complaint they were being "driven like slaves." (JA1260); (JA1699). DOC left these complaints for DPW/MES to handle. (JA1711). The County's designee (Halligan) admitted that MRF detail workers made complaints about working conditions and did so both collectively and individually. (JA1282). There were complaints over long working hours. (JA945-946). Homan admitted MRF detail workers were able to "bargain" for more money. (JA599); (JA1707-1708). MRF detail workers also raised concerns that there wasn't enough food to sustain them for the length of the workday. (JA947); (JA816-817); (JA661-662). Robinson was personally so upset by the hunger of MRF detail workers that he turned a blind eye to their eating discarded food off the SSR line. (JA817-818).

## VII. DPW Controlled MRF Detail Workers.

DPW controlled the manner and means of the work of MRF detail workers. DOC provided no work equipment. (JA668). DPW provided all work gear, including optional safety equipment such as dusk masks or poor-quality gloves. (JA771, JA783-784, JA791); (JA1287, JA1289). DPW provided the orientation, which the Correctional Officers never performed. (JA779). DPW provided the bus and the bus driver to transport the MRF detail workers. (JA1237); (JA492-493). Jones handled the hiring and firing and let supervisors handle discipline. (JA371-372). DPW could terminate a MRF detail worker and have them returned to DOC, with the majority of those decisions made by Jones. (JA385-486, JA398, JA413-414); (JA1320), (JA1321). For example, if a MRF detail worker's gloves were wet and cold and he didn't want to work as a result, he was marked as "refuses to work" by DPW which would trigger DOC to not send that individual back to the MRF.[10] (JA777-778). While most of the workers "did a decent job" DPW did provide corrective counseling. (JA387). DPW adjusted break times and set the schedule. (JA401, JA411). DPW supervisors dealt with work requests from MRF detail workers. (JA422). DPW kept work records (JA1322-1323) and would mark a MRF detail worker as "DNP" ("do not pay" or "do not place") if DPW deemed it

---

[10]    The County's designee refused to testify whether DPW exercised the power to terminate employment more than DOC. (JA1199).

appropriate.  (JA442); (JA776).  Correctional officers would not delegate work duties nor would they keep an eye on whether a MRF detail worker was working in a satisfactory manner, as DPW staff exclusively handled that.  (JA795-797); (JA975).

**VIII.  The "Quota" Of MRF Detail Workers Was The County's Priority.**

The purpose of the MRF is to sort, bale and sell recycled materials, not to "rehabilitate" MRF detail workers.  (JA687-688); (JA1277-1278).  The County could not identify a single document to substantiate the claim that the principal purpose of the MRF work detail was rehabilitative.  (JA1026-1027, JA1020-1021); (JA1716).

DOC's CCP does not draw on any expert advice on how to reduce recidivism among incarcerated persons, (JA1222), let alone on how to make the MRF rehabilitative.  Rather, Audra Parrish, a supervisor of CCP, testified that her responsibility was to "always make sure that the CAF detail was fully supplied with adequate inmate labor." (JA1153-1154).  The County admits that some incarcerated workers who labored at the MRF were recommended for private work release, (JA1205), and that there were two sub-groups of incarcerated workers at the MRF (with same responsibilities): (i) those recommended for private work release by Courts; and (ii) those who had not received such recommendation.  (JA1209). Incarcerated persons who were recommended for work release by the Courts and

had outside jobs were routinely beguiled into working at the MRF.  For example, Harold Snyder, a career firefighter with the Baltimore City Fire Department ("BCFD"), was only allowed to work at the MRF even though DOC officials knew that he was work release recommended by the Court and that he needed to work for the BCFD in order to keep his job.  (JA1359-1360). Mr. Snyder was thus forced to retire from the BCFD to avoid being discharged and losing his pension.  (JA1360-1361).  Similarly, Adam Dulaj, a truck driver who was work release recommended by the sentencing court, worked at the MRF for almost three months despite DOC knowing he had a higher paying job available to him.  (JA1348-1349).

The DOC had no routine practice of seeking work release recommendations after 30 days of working at the MRF.  (JA1344); (JA1348-1349); (JA1359-1360); (JA1414); (JA1425); (JA1671).  Out of 52 "Opt-In Plaintiffs," only <u>two</u> letters seeking work release recommendations have been produced, despite numerous incarcerees working over 30 days at the MRF.  (JA1364-1373).  There is ample record evidence that incarcerees continued to work at the MRF, even after being sentenced, recommended or approved for work release.  (JA1296-1320); (JA1354).

MRF detail workers were not given the benefit of good training.  (JA998).  The MRF work detail "wasn't any of kind of rehabilitation or training opportunity" or an apprenticeship or introduction to working for DPW.  (JA808-810); (JA457).  The County considered forklift certification training but this never materialized.

18

(JA839-841); (JA1697).  The MRF work detail also did not lead to employment with DPW.  (JA457).

The County did not hire incarcerated persons as sorters.  Out of hundreds of incarcerated persons only a few became employed, but they are doing different work (not sorting).  (JA447-449).  Of all the hundreds of incarcerated sorters, Robinson can recall only four individuals hired.  (JA809).  Not only is there a lack of evidence of a routine practice of hiring MRF detail workers after their sentence was complete,[11] the County made no effort to put people formerly incarcerated in contact with the "temp service" used by the County. (JA608).  The MRF did not even give job references to MRF detail workers.  (JA405).

If anything, participating in the MRF work detail would <u>actually</u> prevent a worker from engaging in rehabilitative activities such as taking part in any meaningful job "resource" fairs put on for all incarcerated persons or engage in substance abuse classes.    (JA1346-1347);  (JA1352-1353);  (JA1357-1358); (JA1361-1363); (JA1420-1422); (JA1425-1426); (JA1669-1670); (JA1674-1675). The County pulled MRF detail workers out of the substance abuse program ("START") in order to provide coverage for MRF. (JA1412).  The MRF work detail

---

[11]    Of the thousands of detail workers who have passed through the MRF, the County only hired 6 incarcerated persons during the six-month period during the transition of the MRF from MES to DPW.  (JA1377-1378).  The County has failed to hire even a single detail worker since February 26, 2018.  (JA334-335).

hours were so long that they interfered with practically everything that could possibly occur during normal hours.  Indeed, the Resource Fairs always occurred on weekdays, and ended by mid-afternoon, well before MRF detail workers would return to the BCDC.  (JA1407-1410).  Moreover, only those workers with 90 days or less remaining in their sentence could attend.  (JA1411).  CCP was so fixated on the MRF inmate quota that they even prevented MRF detail workers from going to the dentist.  (JA1220); (JA1718).  Similarly, DOC operated a "Community Reentry Group," with the laudable goal of helping incarcerees reenter society upon release, (JA1216) but at least in one demonstrable instance, a MRF detail worker was required to continue working at the MRF rather than allowed to attend.  (JA1217); (JA1720).  When pressed, the County's designee testified that he did not know what was more important: working at the MRF or attending this group meeting.  (JA1218-1219).  The County admits that harsh working conditions serve no rehabilitative purpose nor does the length of a day serve a rehabilitative purpose.  (JA1028-1029).

Being part of the CCP did not confer any special rehabilitative value or privilege, either.  (JA1347); (JA1353); (JA1363); (JA1418); (JA1422); (JA1670); (JA1675).  The CCP provides no job counseling, no listing of open work release positions, and has no job counselors.  (JA1221-1223).  There were allegedly social workers in CCP (the number unknown), between January 1, 2018 to April 10, 2020, but they worked during the weekday when MRF detail workers would be unavailable

due to their work. (JA1223). There were no job fairs just resource fairs, (JA1143); (JA1407), which detail workers contend they would have been able to attend. (JA1408-1411). CCP was not responsible for, nor work towards, finding detail workers employment upon their release. (JA964-965); (JA706).

## SUMMARY OF ARGUMENT

Under well-settled law, the FLSA protects employees working for enterprises that compete in interstate commerce. Whether a traditional employment relationship has been created for purposes of the FLSA is determined by assessing the totality of the circumstances, as an economic reality.

Here, the correctional authorities, under pressure from County administrators, abused their custodial authority to make short term incarcerees available as a cheap source of labor to a sister agency of the County, the Department of Public Works ("DPW").

The purpose of the work was neither rehabilitative nor served any penological purpose. Rather, in a quest to develop "profits" from the sale of recyclable materials, the incarcerees were worked for subminimum wages for extreme hours, at terms plainly proscribed by the FLSA, if it applies. All of the work was voluntary, outside of the prison, and the incarcerated persons performed the same work as other non-incarcerated persons, who were under the same DPW supervisors, paid the minimum wage and worked a reasonable number of hours. The only practical difference

between the two groups of workers, as an economic reality, was the rate of pay and the length of hours worked.  Needless to say, and as the record evidence amply demonstrates, the County's arrangement was good for business.

No Court has recognized that prisoners working inside prison walls are covered by the FLSA.  But no Court has been willing to close the door completely when work is performed outside the prison.  There is good reason for this caution: as this record amply demonstrates, the predominant purpose of the incarcerated labor allowed the County to substantially reduce its costs and maximize its revenue and profits.  The County was actively seeking, and indeed succeeded, in collecting the recyclables from neighboring jurisdictions.  The County even sought out the labor of incarcerated persons *from another jurisdiction* to satisfy the County's desire for cheap labor, and took other steps, including many practical business steps, to maximize the value of auctioned recyclable materials to commodity purchasers operating in interstate commerce.

While the County will no doubt argue that there was a legitimate penological purpose for this work program, the most any such argument can generate is a genuine issue of material fact.  The ruling below opens the door to the government loaning incarcerated labor for commercial enterprises, or as here to another government agency selling goods in competition with other private entities, for purely economic and non-penological reasons.

The unconscionable practices in this case are at odds with the policies of the FLSA and free market capitalism. This decision below should be reversed and the case remanded for trial.

## ARGUMENT

This appeal presents an extraordinary set of facts where incarcerated persons performed the same work as non-incarcerated persons in a traditional employment paradigm in a profit-making commercial venture.

While repeatedly acknowledging that this case was an issue of first impression, the District Court treated the facts here as the equivalent of inmate labor performed "within a prison." *See Harker v. State Use Indus.*, 990 F.2d 131, 133 (4th Cir. 1993) (Wilkinson, J.) ("we see no indication that Congress provided FLSA coverage for inmates engaged in prison labor programs like the one in this case"). The Court erred in granting Summary Judgment to the County because it decided questions of fact and relied on pure labeling and on inadmissible evidence. Moreover, the District Court erred in deciding that the purposes of the FLSA would not be advanced under the facts of this case. If affirmed, the District Court's decision directly collides headfirst into a nearly indistinguishable case which held that incarcerated workers at a county recycling facility in Pennsylvania were covered FLSA employees. *See Burrell v. Staff*, 60 F.4th 25, 46 (3d Cir. 2023), *cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell*, 143 S. Ct. 2662 (2023). If

anything, this case presents even more compelling reasons and extraordinary circumstances than *Burrell*.

This Court should reverse and remand for trial to allow a jury to determine whether Appellants are employees under the unique set of facts presented here, relying on the "economic realities" and "totality of circumstances."

On this record, a reasonable jury could conclude that the primary purpose of the work was economic and not rehabilitative. The MRF detail workers were involved in producing commodities moving in the national economy. The MRF detail workers labored under a voluntary arrangement, in which there is evidence of the same sort of bargaining that occurs in a traditional employment paradigm. Unlike traditional work performed by prisoners within a jail, the DOC asserted little control over the putative employment relationship. Non-incarcerated workers competed for jobs with incarcerated workers, and the County's recycling plant competed with other private waste recyclers, as evidenced by the County seeking to collect the recyclable materials *from other counties*. The County prioritized cheap incarcerated labor over higher-paid temp labor, that it literally sought to have inmates *sentenced* to work at the MRF <u>and</u> sought inmates from Baltimore City. (JA1070, JA835-838, JA1702).

Indeed, the County's suspension of this MRF work detail due to this litigation has proven that the mere *threat* of FLSA enforcement has already *created* private

sector jobs, thus serving the FLSA's goals of spreading employment.  This is a case where the MRF work detail was paid *from* the budget of DPW, and therefore, there is no threat to DOC's budget if the incarcerated workers here are paid the minimum wage, just like their non-incarcerated co-workers.

When you have incarcerated workers leaving prison; performing commercial related work that is obviously not benefiting a DOC or providing rehabilitative training; and the incarcerated workers are producing goods moving in interstate commerce and are not paid by their jailer but by the putative employer; and where the incarcerated workers are free to decide whether to work (and whether to quit); and where non-incarcerated workers compete job-for-job with incarcerated work pool, then assuredly the FLSA covers that worker.

This Court should reject labels and consider whether the predominate purpose of the MRF detail work was rehabilitative, benefiting the incarcerated worker, or economic, benefiting the putative employer.  As the outcome of the true economic realities here, at least on this record and as recognized by the District Court, is a question of disputed fact, this Court should remand to the District Court for Trial.

## I.    Standard of Review

The question of how workers spend their working time is a question of fact, and an ultimate determination of employee status is a question of law subject to *de novo* review.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Schultz*

*v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 n.3 (D.C. Cir. 2001) (whether an individual is an employee under the FLSA is a legal question, but any subsidiary factual issues leading to this conclusion are questions of fact for the jury); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987).

This Court reviews "'de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party.'" *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1036 (4th Cir. 2020) (*quoting Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020)). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Id*. at 1037. To survive summary judgment, the non-moving party must demonstrate "specific, material facts exist that give rise to a genuine issue." *Id*. "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* "When determining whether a genuine issue of material fact has been raised, the court must construe all reasonable inferences and ambiguities against the movant and in favor of the nonmoving party." *Id*.

## II.     The District Court Erred As A Matter Of Law In Ruling The MRF Detail Workers Were Not Employees Under The FLSA.

### a.     *Harker* Is Confined To Prison Training Or "Prison Housework."

In its decision, the District Court correctly and repeatedly acknowledged that "the Fourth Circuit has yet to analyze off-site inmate work under the FLSA." (JA1826); *see also* (JA1813) ("The Fourth Circuit has categorically excluded work conducted within a prison from the FLSA's purview; however, it has yet to directly opine on a case involving work conducted off-site.").

Nevertheless, this District Court concluded that it would apply "factors" "adopted in *Harker*," to "govern … whether Plaintiffs are 'employees' for the purposes of the FLSA." (JA1826).

Applying a case justifying a categorical exclusion from the FLSA, such as *Harker*, is clear legal error because *Harker* was never *intended* to be applied to incarcerated labor performed outside of a prison, for non-correctional authorities in a work program such as the case here.  *Harker* was limited to its specific set of facts by this Court and should remain so confined.   *Harker* actually *supports* the Appellants here, because this case presents the exact "extraordinary circumstances" where the FLSA would apply to incarcerated workers, which *Harker* specifically left open its decision.   *Harker*, 990 F.2d at 135 (recognizing "extraordinary circumstances" could "trigger FLSA coverage").

By way of background, the plaintiff in *Harker* worked *inside* a prison, in a print shop run by State Use Industries of Maryland ("SUI"), which was a creation of Maryland statutory law. *Harker*, 990 F.2d at 132. The goods were limited to sale to only government agencies and could not be sold on an open market. *Id*. at 132.

The question presented in *Harker* was "whether inmates participating in prison work programs are covered by the [FLSA]."[12] *Harker*, 990 F.2d at 132. Within the first paragraph of *Harker*, this Court succinctly stated that "[b]ecause we find no indication that the FLSA applies, or was ever meant to apply, to *such* inmates, we affirm the dismissal… ." *Id*. (emphasis added). *Harker's* holding is therefore quite limited, i.e., the FLSA does not apply to incarcerated persons who work inside a prison in a SUI, with goods not sold openly on the market, because there is no indication that the FLSA was ever meant to apply to "such" inmates. *Harker*, 990 F.2d at 133 ("we see no indication that Congress provided FLSA coverage for inmates engaged in prison labor programs *like the one in this case*") (emphasis added).

Writing for this Court in *Harker*, Judge Wilkinson observed the following:

First, "the labor performed in *SUI programs* differs substantially from the traditional employment paradigm covered by the [FLSA]" because SUI does not aim

---

[12]    Obviously, the question presented *here* is dramatically different than in *Harker*.

to turn a profit.  *Id*. at 133 (emphasis added).  Second, there is no "bargained-for exchange of labor" because "DOC wields virtually absolute control" "to a degree simply not found in … true employment." *Id*.  Inmates are "not free to walk off the job site and look for other work." *Id*.  Third, inmates' needs are met by the DOC, and therefore, inmates have no "credible claim" to a minimum wage to ensure their welfare… ."  *Id*.[13]  To the extent that the FLSA's purpose of preventing unfair competition might be implicated, *Harker* emphasized that the "limited ways in which *SUI goods* might enter the open market" did not threaten fair competition. *Id*. at 134 (emphasis added).

These observations are mere *dicta* to *Harker*'s conclusion that incarcerated workers laboring within a prison are <u>categorically</u> not employees under the FLSA. *Id*. at 135. *Harker*'s holding rests entirely on other Court decisions that "have refused to apply the FLSA to work done by inmates *behind prison walls* for any type of prison-operated industry or for the prison itself.  We agree with those courts holding categorically that such inmates are not covered by the [FLSA]." *Id*. at 135.

---

[13]     This tautological observation that incarcerated workers are not entitled to the minimum wage because the government already provides incarcerees with "three hots and a cot," is totally at odds with core Supreme Court precedent that FLSA coverage does not turn on whether or not a worker's welfare is threatened by their loss of minimum wage.  *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 44, 143 S. Ct. 677, 682 (2023) ("Employees therefore are not 'deprived of the benefits of [the FLSA] simply because they are well paid.'" (*quoting Jewell Ridge Coal Corp. v. Mine Workers*, 325 U.S. 161, 167 (1945)).

In fact, the *Harker* decision emphasized its categorical exclusion of inmates performing work *within* a prison no less than six (6) times (concluding "[i]f the FLSA's coverage is to extend *within* prison walls, Congress must say so, not the Courts", *id*. at 136 (italics added)). Similarly, the *Harker* decision emphasized the work being performed "inside" prison no less than six (6) times (rejecting case-by-case examination "when an inmate works inside prison walls", *id*. at 135).

Important to understanding *Harker* is the case law upon which it rests. *Harker* rests entirely upon the Seventh Circuit's decision in *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), a fact that the District Court correctly observed. (JA1821) ("Fourth Circuit … largely adopted *Vanskike*'s analysis"). *Harker* cited *Vanskike* seven (7) times, while the District Court cited *Vanskike* twenty-one (21) times. *Vanskike* was filed by a pro se inmate who worked within a prison and who alleged his labor was "forced." *Vanskike*, 974 F.2d at 806, 808.

Yet *Vanskike*, upon which *Harker* is based, itself joined with other Circuits and held that "prisoners are not categorically excluded from the FLSA's coverage simply because they are prisoners." *Id*. at 806, 808. *Vanskike* distinguished its facts from situations where prisoners "performed work for private, outside employers" and "were given the choice to work rather than being assigned to do so." *Id.* at 808. *Vanskike* asked: "what is the 'economic reality' of the relationship between DOC and Vanskike?[,]" observing that the traditional test to determine employee/independent

30

contractor status was "not the most helpful guide in the situation present here." *Id*. at 809. *Vanskike* observed that typically "the question is essentially whether there is *enough* control … to classify … as an employee. But here we are coming at the definition of 'employee' from the opposite direction: there is obviously enough control over the prisoner; the problematic point is that there is *too much* control to classify the relationship as one of employment." *Id*. at 810. While generally observing that prisoners are "essentially taken out of the national economy upon incarceration[,]" *Vanskike* recognized that its ruling could be different "if there were a suggestion … of a private, outside employer using the labor of prisoners" where the "services of prisoners might be used to confer a prohibited unfair advantage on a competing business." *Id*. at 810, 812. Thus, "the FLSA was not designed to encompass the *present* scenario … ." *Id*. (emphasis added). Indeed, *Harker*, resting squarely upon *Vanskike*, can only fairly be read to create a categorical exclusion of FLSA coverage when work is performed *inside* a prison.[14]

Therefore, the only fair reading of *Harker* is that it is limited to circumstances where incarcerees performs prison "housework" or work in prison-industries.

---

[14]    This Court has repeatedly limited *Harker* to work *within* a prison. *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 451-52 (4th Cir. 2021); *Torcasio v. Murray*, 57 F.3d 1340, 1345 (4th Cir. 1995).

b.     **The MRF Work Detail Must Be Viewed Using An "Economic Realities" Test, Taking Into Account The "Totality Of Circumstances."**

While the District Court correctly observed that *Harker* rested upon *Vanskike*, and indeed the District Court cited *Vanskike* more than it did *Harker*, the District Court erred by resting its decision on the notion that *Vanskike* presents a number of "factors" upon which inmate FLSA coverage is determined. Neither *Vanskike* nor *Harker* use the term "factor" in setting forth a test to determine whether an inmate may be covered under the FLSA in every instance where an inmate may perform work, *including* outside of a prison. Neither case was intended to create a test to determine whether incarcerated labor is covered under the FLSA.

Indeed, the most recent inmate FLSA case in this Circuit, *Ndambi et al. v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021) never uses the term "factor." To be sure, *Matherly v. Andrews, et al.*, 859 F.3d 264 (4th Cir. 2017) used the term once, but the use of the term was dicta as this Court had already concluded the inmate working inside of a prison could not bring an FLSA claim, as the "claim [ran] head first into our FLSA jurisprudence" citing *Harker*. *Matherly*, 859 F.3d at 278. The *Matherly* Court's use of the term "factors" was mere dicta *not* intended to create a test for inmate FLSA claims. *Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 36 F.3d 8, 11 (4th Cir. 1994) ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest *dicta.*")

32

The District Court's error is compounded not just because it incorrectly held that *Harker* had created a three "factor" test to determine coverage (and sought to apply those "factors" to the case at bar), but because the District Court failed to examine the "economic realities" of the labor performed *in this case*, based on the "totality of the circumstances."

The District Court ignored what the Supreme Court and this Court has repeatedly relied upon to determine whether a worker is an employee for purposes of the FLSA, namely, an economic realities test that takes into account the "totality of the circumstances."[15] *See*, *e.g.*, *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 239 (4th Cir. 2016) (repeatedly emphasizing that the "economic realities" are viewed through the "totality of circumstances," and stating: "[t]he court properly captured the economic reality of the relationship here, and we now affirm its judgment") (Wilkinson, J.).

To be sure, it should be obvious the test for determining whether an *incarceree* is an *employee* would <u>not</u> be based upon the more-familiar test of whether an employee is (or is not) an independent contractor.  *See, e.g.*, *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 150 (4th Cir. 2017); *McFeeley v. Jackson St. Ent., LLC*,

---

[15]    Indeed, an economic realities test driven by the totality of the circumstances serves as the underlying premise of *Vanskike*.  *Vanskike*, 974 F.3d at 808, 809 ("Because status as an 'employee' for purposes of the FLSA depends on the totality of the circumstances rather than on any technical label, courts must examine the 'economic reality' of the working relationship").

825 F.3d 235, 241 (4th Cir. 2016) ("the court must adapt its analysis to the particular working relationship, the particular workplace, and the particular industry in each FLSA case."); *Schultz v. Cap. Int'l Sec.*, 466 F.3d 298, 304 (4th Cir. 2006).  As *Vanskike* correctly observed, typically the question in employee coverage cases is whether there is *enough* control, but in "inmate-as-employees" cases, the question is whether there is *too much* control.  *Vanskike*, 974 F.2d at 810.  Similarly, this Court has noted that the traditional six factor economic realities test is of limited utility in other contexts, such as whether someone is a volunteer or employee.  *See Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 433-34 (4th Cir. 2011).

Instead, the "economic realities" test that is referred to herein by Appellants is not the same as the economic realities test described in *McFeeley* and *Schultz*, *supra*, but rather an economic realities test used to determine whether work generally fits a traditional economic paradigm.  In *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 453 (4th Cir. 2021), this Court confirmed that a "similarly named—but distinct—'economic reality' test from *Schultz*[,]" typically used to determine employee vs. independent contractor status is not the same "economic realities" that are determined when weighing whether the work fits a traditional employment paradigm.  *Id*.  According to *Armento*, in such a case, the correct approach to determining employee status is the "totality of the circumstances[.]"  *Id*.

The District Court erred by not evaluating the "totality of circumstances" of this case using the economic realities of a given situation (and erred again by not viewing the totality of the circumstances in the light most favorable to the Appellants, the non-moving party).  *Salinas*, *supra*; *McFeeley*, *supra*; *Steelman v. Hirsch*, 473 F.3d 124, 129 (4th Cir. 2007) ("courts have been exhorted to examine 'the circumstances of the whole activity,' rather than 'isolated factors,' or 'technical concepts' " (*quoting Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947) and *Goldberg v. Whittaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)); *Schultz*, 466 F.3d at 304 ("no single factor is dispositive" and "test is designed to capture the economic realities"); *see also Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("Since the test concerns the totality of circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided.").

Ultimately, what matters is whether the "circumstances reflect a 'traditional understanding of employment.'" *Armento*, 856 F.App'x 445, 451 (4th Cir. 2021) (*quoting Steelman*, 473 F.3d at 129 (internal quotations omitted)).

In a given work situation involving incarcerated persons, the question is whether, as a matter of economic reality, the incarceree is performing work comparable in a "traditional employment paradigm," *Harker*, *supra*, such as an inmate performing private work release, or is the work "prison housework" or "prison industry" work which is denied FLSA coverage?

35

This flexible test, relying not on any one single fact, *see Schultz*, 466 F.3d at 305 ("[n]o single factor is dispositive"), allows for determinations based on the economic realities, while avoiding situations where vulnerable incarcerated persons can be subject to exploitation and abuse by merely labeling the work "rehabilitative." *Cf. Rutherford Food,* 331 U.S. at 729 ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]."). "In sum, 'the more indicia of traditional, free-market employment the relationship between the prisoner and his putative 'employer' bears, the more likely it is that the FLSA will govern the employment relationship.'" *Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) (*quoting Henthorn v. Dep't of Navy*, 29 F.3d 682, 686 (D.C. Cir. 1994)).

Here, this Court must look at the "totality of circumstances" and "economic realities" to determine whether the work is similar to the "traditional employment paradigm," just as it has always done. *Harker*, 990 F.2d at 133. In weighing the record evidence in this case, and using a "contextual, common-sense approach" to the understanding of what constitutes an employee, *see Steelman*, 473 F.3d 129, there can be no doubt that the District Court erred in granting summary judgment.

c.   **The Economic Realities, As Measured By The "Totality of The Circumstances," Clearly Demonstrate The MRF Detail Workers Were Covered Employees.**

The totality of the circumstances here, viewed in the light most favorable to the non-moving party, reveal a genuine dispute of fact as to the existence of a covered employment relationship under the FLSA that cannot be resolved at summary judgment.

i.   **The Primary Purpose Of The Work Was Economic.**

This Court first looks to the primary purpose of the work as the most *important* factor in determining employee FLSA coverage. *Armento*, 856 F.App'x at 452 ("we have repeatedly emphasized the relationship's primary purpose as an important factor"). Similarly, in other circumstances, the Court looks to the primary beneficiary of work, to determine employee coverage issues arising under the FLSA. *See Harbourt v. PPE Casino Resorts Maryland, LLC*, 820 F.3d 655, 658 (4th Cir. 2016) (determining FLSA employee coverage by balancing primarily beneficiary of the work, i.e., trainee or employer).

Here, the issue is whether the *primary purpose* of the work is rehabilitative and benefits the inmate, relying not on "technical labels," or is the predominate purpose of the work commercial?

On this record, the primary purpose of the work is a disputed question of fact that must be left for the jury in order to determine whether the FLSA applies here.

The County readily *admits* that the purpose of the work was to sort recyclable materials, not to "rehabilitate" MRF detail workers. (JA687-688); (JA1277-1278). The County cannot identify a single document to substantiate any claim that the principal purpose of the inmate MRF work detail was rehabilitative. (JA1026-1027, JA1020-1021); (JA1716).

A reasonable jury could conclude that the *primary* purpose of the MRF detail was commercial, given the County's aggressive "quota," demanded by County Administrators who put pressure on DOC to supply a sister agency with manpower. As outlined above in Section Statement of Case VIII, there is no genuine training program, no valuable skills learned, no resume building, and not even a reference given. (JA457, JA808-810, JA998). There is no genuine post-incarceration employment opportunities with DPW. The MRF work detail quota was so important to the County, as a commercial matter, that the County even prevented MRF detail workers from going to the dentist or attending substance abuse meetings. (JA1220, JA1412, JA1718) Indeed, a reasonable jury could conclude that the sole focus of the County was to maximize possible revenue from the MRF with minimizing the cost of labor, regardless of the harm it could cause to the incarcerated workers. Beichler admitted that he thought it was too much work for the MRF detail workers, but it "didn't make any difference" when raised with Homan. (JA653). The long hours and poor conditions undermine any argument that primary purpose of this work was to benefit the MRF detail workers.

38

Allowing inadmissible evidence over objection,[16] the District Court concluded that the "[u]ncontroverted evidence shows the MRF work detail program served both economic and rehabilitative purposes." (JA1831). But the District Court did not look to the primary purpose of the work. The District Court's essential error was ruling that *any* rehabilitative effect was sufficient to foreclose coverage under the FLSA. (JA1831). The Court misconstrued the holding in *Ndambi* that any rehabilitative value automatically outweighs any "profit motive." (JA1831). The District Court's analysis is a perfect example of placing technical labels on the work, rather than examining the economic realities. In this case, a jury could reasonably conclude that the primary purpose of work was economic and benefited the County.

### ii.    The MRF Detail Workers Were Involved In The National Economy.

Repeatedly. cases have held that incarcerated persons working *inside* prisons are not covered by the FLSA on the justification that they have been removed from the "national economy." *See, e.g.*, *Vanskike*, 974 F.2d at 810 ("Prisoners are essentially taken out of the national economy upon incarceration."). This is natural, because the FLSA concerns itself with interstate commerce. *See, e.g.*, 29 U.S.C. § 202(a).

---

[16]     Appellants assign this as error, see Argument, III, *infra*.

Therefore, the totality of the circumstances requires Courts to determine whether the work contributes to the flow of goods and services in interstate commerce, unlike prison housework, *Ndambi, supra*, or prison training programs, *Harker*, *supra*.

Here, it is plainly evident that MRF detail works were not removed from the national economy, which served as the justification to exclude FLSA coverage in *Vanskike*, 974 F.2d at 810, but instead were providing a service (sorting) that produces goods (bales of recyclable materials) that flow in interstate commerce.

### iii.    The MRF Detail Work Was Voluntary.

It is plainly evident that a jury could reasonably conclude that the MRF detail workers were performing work on a voluntary basis. *Henthorn*, 29 F.3d at 686 ("we hold that a prerequisite to finding that an inmate has "employee" status under the FLSA is that the prisoner has freely contracted with a non-prison employer to sell his labor"). The District Court here recognized that the work here had a "voluntary nature" to it. (JA1834 & JA1834 n.7).

### iv.    DOC Asserted *Too Little Control* Over The Putative Employment Relationship.

*Vanskike* observed that the "problematic point" in inmate FLSA cases, which makes their circumstances atypical from more traditional employee coverage inquiries, is that the jailer exerts "too much control by the jailer to classify the relationship as one of employment." *Vanskike*, 974 F.2d at 810.

40

Therefore, the converse must be true:  if corrections asserts *too little control*, then that must be a factor under the totality of the circumstances.

Here, that is a triable issue of fact.  The District Court stated:  "It is unclear from the record the degree of actual supervision exercised by DOC over its work detail inmates at the MRF."  (JA1808).  To be sure, Appellants contend the record is more than sufficiently clear to find that corrections exerted little to no real influence over the work.  Corrections did not direct, train or assign the MRF detail workers to their stations.  As set forth in Section Statement of Case I & II, *supra*, DPW assigned work, instructed MRF detail workers, and exercised the power to fire just like a private sector employer (and just as they did to the non-incarcerated "temps").  There is evidence that correction officers were unarmed, retired, and spent their time feeding birds as opposed to supervising inmates during bathroom breaks. (JA1170-1171); (JA1233); (JA830); (JA1627-1628); (JA1722).  A reasonable jury could conclude that (1) the MRF detail workers were not subject to the same level of custody as an incarcerated person working *inside* a prison, performing *prison labor*; and (2) the unarmed correction officers, who would not even intervene in the event of a fight let alone stop an escape, (JA1627-1628), (JA441), but who frisk MRF detail workers upon their return,[17] were primarily present to control potential contraband.  This element is satisfied.

---

[17]    Incarcerees in private work release, who are undisputedly covered by the FLSA, are similarly frisked for contraband upon return to the detention center. JA1736.

**v.      The Purposes Of the FLSA Are Served By Extending FLSA Coverage To The MRF Detail Workers.**

Writing in *Steelman v. Hirsch*, 473 F.3d 124, 129 (4th Cir. 2007), Judge Wilkinson explained that *Harker* turned on whether the FLSA policies would be served by finding coverage:

> *Harker* demonstrates how the[] objectives [of the FLSA] can illuminate the scope of the [FLSA] in specific cases. We held that a prison labor program was not subject to the FLSA in part because coverage would not serve the Act's purposes: the Department of Corrections provided for inmates' material needs already and another law prevented prison goods from being used in a manner that would threaten fair competition. *Harker,* 990 F.2d at 133–34.

> *Steelman*, 473 F.3d at 132 (Wilkinson, J.).

In other words, the key to *Harker*, according to *Steelman*, was whether the purposes of the FLSA would be advanced by establishing coverage.  *Steelman*, 473 F.3d at 131-32 (*citing Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985)).

Here, the District Court acknowledged that the FLSA has more than two recognizable purposes.  But the District Court failed to acknowledge that this Court has repeatedly acknowledged that one of the policies undergirding the FLSA is to "spread employment by placing financial pressure on employers to hire more workers."  *Conner v. Cleveland Cnty., N. Carolina*, 22 F.4th 412, 420–21 (4th Cir.), *cert. denied sub nom. Cleveland Cnty. v. Conner*, 143 S. Ct. 523, 214 L. Ed. 2d 300 (2022); *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 121 (4th Cir. 2015)

(*quoting Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40 (1944)) *Benshoff v. City of Virginia Beach*, 9 F. Supp. 2d 610, 616 (E.D. Va. 1998), *aff'd* 180 F.3d 136 (4th Cir. 1999).

In this case, it is undisputed that the County has incarcerated persons perform the same sort of work at the MRF as non-incarcerated persons. (JA375). As the District Court observed, as a result of this lawsuit, the County has discontinued the MRF work detail. (JA 1325, JA1705-1706). By doing so, the County has proven two points: first, by replacing these incarcerated workers with non-incarcerated workers, the County has *created* jobs earning at least the minimum-wage. (JA919, JA1050, JA1018). The County has therefore proven that the mere enforcement of the FLSA has satisfied one of the purposes of the FLSA, to wit, creating more (and better paying) employment opportunities. *Cf. Burrell*, 60 F.4th at 46 (finding relevant to the "economic realities" test that inmate work at a recycling center benefited Lackawanna County, among other defendants, because the "work 'benefited Defendants by reducing the need for paid employees'") (internal citation omitted)). Second, the evidence establishes that the County reduced its need for temps by turning to incarcerated labor, proving that temps competed in a labor pool that included sub-minimum wage workers. The more incarcerated labor, the fewer the temps.

To be sure, another purpose of the FLSA is the avoidance of unfair competition. There can be no *genuine* dispute that private waste and recycler haulers, such as Waste Management, have indicated that they compete with municipalities and that they do not use inmate labor. (JA508, JA1733). There can also be no dispute that the County was seeking to obtain valuable contracts to recycle the waste of *other* counties. (JA1071). By seeking recyclables from other jurisdictions, the County totally undercuts any argument that its operations were performing a core government function, to wit, the elimination of refuse within the County's jurisdiction. Given the volume of evidence set forth in Section Statement of Case, III, *supra*, a reasonable jury could easily determine that the County was running a business-like operation at the expense of private businesses operating at an economic disadvantage, because they did not use incarcerated labor.

The District Court's error was not focusing on the impact of the County's operations on *other* waste management operators or the competition for jobs that the County's use of inmate labor created. Unfair competition occurs when other market participants do not enjoy the same advantages as other market participants (competitors). The focus must be on *competition* and *competitors*.

The County's determination to rid itself of its private partner (MES),[18] should demonstrate the County's determined efforts to be a full market participant whose

---

[18]    Notably, the County cut its private partner (MES) in 2017.

workers must all be covered by the FLSA.  The District Court's analysis of *Burrell*, finding significant that Lackawanna County had a private entity as a partner, offends core principles of the FLSA because it incentivizes counties, including Lackawanna County, to operate like the County did here, creating a "race to the bottom." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (recognizing the FLSA's goal of preventing a race-to-the-bottom); E*MPLOYMENT* L*AW* – F*AIR* L*ABOR* S*TANDARDS* A*CT* – F*OURTH* C*IRCUIT* H*OLDS THAT* D*ETAINED* I*MMIGRANT* W*ORKERS* A*RE* N*OT* "E*MPLOYEES*" U*NDER* T*HE* F*EDERAL* L*ABOR* S*TANDARDS* A*CT*. – N*DAMBI V*. C*ORE*C*IVIC,* I*NC.*, 990 F.3d 369 (4th Cir. 2021), 135 H*ARV*. L. R*EV*. 1512, 1517 (Mar. 2022) (observing that "'race to the bottom' behavior was exactly the kind of industry phenomenon that the FLSA's wage floor was enacted to preclude.").  According to the District Court's flawed analysis of unfair competition, if counties just do away with their private partners, they can utilize incarcerated labor.  If anything, any decision that incentivizes and allows municipalities free reign of incarcerated labor (so long as they do not have a private partner), only further damages American enterprise and minimum wage jobs.

On this record, there is *more* compelling evidence of unfair competition than *Burrell*, a very factually similar case finding FLSA coverage, because in *Burrell* the

inmates did not work with non-incarcerated persons.[19]   Here, non-incarcerated

persons literally competed with *inmates* for jobs; the more inmates the less

employment for non-incarcerated persons.  Affirming the District Court's decision

could actually *destroy* the minimum wage paying jobs the County created when it

ceased the MRF detail work due to this litigation.

Finally, in passing the FLSA, Congress sought to rectify labor conditions that

are "detrimental to the maintenance of the minimum standard of living necessary for

health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).   The

District Court recognized this obvious purpose, (JA1835-1837), but missed the real

point raised.

For example, all of these inmates in this case are short term inmates.  Scott

needed money to maintain his rent and support his pets.  (JA143, JA239, JA241).

Dulaj needed money for child support.  (JA114, JA1351).  Even jail officials

recognized that inmate earnings in CCP were used for family and court

(restitution/fine) obligations. (JA1210).

---

[19]      The District Court emphasized that "any commercial advantage attained by
DPW" flowed to the County, who also pays to house/care for the inmates. (JA1838).
But what, if any revenue from the MRF "flows" to BCDC is not relevant to what
impact the County's operations have on American industry. 135 Harv. L. Rev. at
1516 ("the FLSA also reflected Congress' desire to protect American industry itself"
by protecting "hirers with 'good labor standards' from 'ruthless' undercutting by
'substandard' competitors."

The FLSA refers to general well-being of workers, and nowhere in the FLSA do protections turn on the well-being of the putative employee in question. The focus is on workers *as a whole* in the national economy. Non-incarcerated persons seeking to earn a living should not have to compete with incarcerated persons being paid sub-minimum wages. Moreover, the reasoning itself is odd: "a worker's preexisting entitlement to certain basic subsistence needs does not necessarily absolve hiring entities from complying with the FLSA." 135 Harv. L. Rev. at 1519. Moreover, the notion that DOC is already providing minimum standards rests on incorrect/incomplete assumptions about the nature of minimum standards, especially as to *these* incarcerated workers. The District Court's decision ignores the reality that incarcerated persons, whether contemnors like *Burrell* or the short-term inmates here, still have bills like rent or automobile payments that come due, still owe child support or other family obligations, may have court fines and other restitution orders to pay, and as demonstrated in the record, need to purchase clothes and to supplement their food *in order to work*. *See* Hauptman, THE HEALTH AND SAFETY OF INCARCERATED WORKERS: OSHA'S APPLICABILITY IN THE PRISON CONTEXT, 37 Lab. Lawyer 1, 81-82 (2023) ("Basic nutrition, warmth, support, and connection with family are necessary to a minimum standard of living, and courts' disregard of the true economic reality of incarceration is illustrative of a larger devaluation of those incarcerated as both workers and people.").

Finally, to *not* cover these MRF detail workers leads to the perverse incentive wherein the County would be able to avoid other important worker protections, like OSHA compliance. In this case, no precautions were taken over worker contact with asbestos and toxic materials. (JA781-782); (JA669).

This record demonstrates the need for enforcement of the FLSA to prevent the government from systematically exploiting incarcerated persons for their labor. The DOC here engaged in modern-day "convict leasing" with a sister government agency. The origins of convict leasing are shameful and present additional policy reason why the FLSA should cover these workers. *See* Whitehouse, *MODERN PRISON LABOR: A REEMERGENCE OF CONVICT LEASING UNDER THE GUISE OF REHABILITATION AND PRIVATE ENTERPRISES*, 18 Loy. J. Pub. Int. L 89, 95 (2017) (convicting leasing filled the void left by slavery).

### vi. MRF Detail Workers Were Paid From The DPW Budget.

In weighing the totality of circumstances, one important consideration is whether an incarcerated worker would be paid from a correctional institution's budget. Quite clearly, *Harker* turned on the concern that by "[f]orcing states to pay the minimum wage to every inmate involved in an SUI-type program would dramatically escalate costs and could well force correctional systems to curtail or terminate these programs altogether." *Harker*, 990 F.2d at 136. But here, it is undisputed that the MRF detail workers were paid by DPW not the DOC. (JA655,

JA57-58, JA906-907, JA1228, JA1230-1231, JA1173, JA1692-1696).  Being paid by some entity *other than corrections* is a factor used to find FLSA employment.  *Watson v. Graves*, 909 F.2d 1549, 155-56 (5th Cir. 1990); *Carter v. Dutchess Community College*, 735 F.2d 8, 15 (2d Cir. 1984) (considering factor in employment when putative employer sent compensation directly to inmates' accounts).

The District Court failed to even address this critical distinction in its decision.

### vii.    This   Case   Presents   The   "Extraordinary Circumstances" Warranting FLSA Coverage.

Although the "totality of the circumstances" test is appropriate for FLSA employee determinations, *Harker* referred to "extraordinary circumstances" in the application of inmate FLSA cases.  *Harker*, 990 F.2d at 135 (recognizing "extraordinary circumstances" could "trigger FLSA coverage").  In particular, *Harker* cited *Watson*, *supra*, for this proposition.  In *Watson*, a sheriff allowed inmates to be loaned out for $20/day to perform work for a relative who competed in the private sector.  *Watson*, 909 F.2d at 1554-56.  The Fifth Circuit observed that the facts of *Watson* read like a Hollywood movie script.  *Id*. at 1551.

The facts and circumstances here are similarly hard to believe could occur in a prosperous Maryland county in the 21st century.  The County, focused on its "quota" and the MRF's potential for revenue generation, took the following shocking steps that seem utterly unreal but for their provability:

- The County denied private work release recommendations from county judges to the economic detriment of Harold Snyder and others, for the transparent reason of maintaining staffing levels at the MRF due to County Administrator pressure on the DOC. (JA1359-1360);

- The County worked MRF detail workers to such an extent that they were unable to engage in any of the programs offered by DOC, even preventing at least one MRF detail worker from attending the dentist to maintain his toil. (JA1220); (JA1718); (JA1217); (JA1720);

- The County eagerly sought to collect recyclables from numerous jurisdictions in the mid-Atlantic, operating a veritable business in competition with private enterprises, which resulted in the MRF operating longer hours to the detriment of its incarcerated labor pool. (JA1071); and

- The County's DOC was being given instructions over its prisoners, such as the amount of work hours for MRF detail workers, resulting in the functional loss of control by the DOC over not just the working relationship but in essence the prisoner.  (JA1699 & fn.9).

The County also amazingly considered putting to work *Baltimore City* inmates not to rehabilitate them but to exploit another captive labor pool (JA835-838); (JA1702), and considered getting county judges to sentence people to work at the MRF.  (JA1070, JA835-838, JA1702).

Like *Watson*, the incarcerees here were loaned out and unconscionably used to produce goods sold in a competitive private industry. Like *Watson*, the incarcerees were paid by their putative employer. The work here was functionally no different than private work release, which is undeniably covered by the FLSA.[20] Although these incarcerees had lost their freedom, many had not lost the right to private work release, but it was the County that shamelessly denied judicial recommendations for private work release so the County could inexpensively staff its MRF.

III. **Even If The District Court Applied The Appropriate Test, The District Court Nevertheless Erred By Deciding Disputed Issues of Material Fact And Admitting Inadmissible Evidence.**

a. **If The District Court Applied *Harker*, It Still Improperly Decided Disputed Issues of Fact.**

Appellants do not believe that *Harker* or any of its progeny have any application or useful reasoning to this case. But if there is a three-factor *Harker* test, the District Court impermissibly decided disputed issues of fact.

i. **The Purpose Was To Turn A Profit.**

If *Harker* has a first factor applicable to this case, i.e., whether "the purpose of the program was to turn a profit;" *Matherly*, 859 F.3d at 278, the District Court erred as a matter of law in applying such a factor. According to the District Court's

---

[20]    MRF Detail Worker Jeffrey Welshons was even told working at the MRF *was* work release. (JA1760).

analysis, all work is rehabilitative and any evidence of rehabilitative purpose trumps any economic motive. (JA1831) (any rehabilitative value of the work "weighs against application of the FLSA in this case, regardless of the additional profit motive.").

But the evidence that the County relies upon, and the District Court erroneously admitted, is inadmissible lay testimony. The District Court stated that "Defendant's witnesses sufficiently demonstrate their familiarity with the work detail program and its effect on its participants[,]" (JA1828, n.3), but there is no basis for this finding. The County's affiants present no first-hand knowledge of empirical evidence that work at the MRF reduces recidivism. None of the County's witnesses have been qualified as experts in a sociological or psychiatric field, none have conducted any studies or surveys to empirically substantiate the claim of reduced recidivism, and none can show a connection between their experiences and testimony that the work is rehabilitative in nature.[21] *See Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Engineering*, 57 F.3d 1190, 1193 (3rd Cir. 1995).

In addition, the District Court improperly allowed Federal Rule of Evidence 406 (habit) evidence to support the County's claim that the MRF work detail was a

---

[21] Rehabilitation, after all, concerns a person's life and success *after* incarceration. None of the County's witnesses observed or otherwise monitored the Appellants' lives after release.

"steppingstone."  The District Court wrote that "Defendant does not require Rule 406 to introduce evidence demonstrating the personal observations of DOC staff and the actions taken by them to advance the inmates' work statuses."  (JA1828, n.4). But the County was not introducing the personal observations of DOC staff.  The County relied on only a few letters (JA336-342), certainly not "numerous enough" "to establish such pattern of conduct" and the County's reliance on the testimony of its Rule 30(b)(6) witness (JA1225) was based on hearsay, because the designee testified that the only basis for his knowledge is from talking to Rodney Hicks. (JA1225).  The burden of proving the existence of the habit or routine practice is on the proponent of the evidence.  *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 511 (4th Cir. 1977); *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 27 (D.D.C. 2008) (burden of establishing habit/routine-practice evidence rests on proponent of evidence).

The County does not get the benefit of inadmissible evidence and at most, this evidence if admitted, would create a genuine issue of disputed material fact in dispute.  A jury should decide whether the work is rehabilitative or profit seeking. This Court should not accept a label that the work was rehabilitative and disregard the existence of a very clear factual dispute over whether "the purpose of the program was to turn a profit[.]"  *Matherly*, *supra*.

## ii.     There Existed A Bargained-For-Exchange.

Next, if *Harker* has a second factor, i.e., whether the work relationship was the product of a bargained-for exchange, *Matherly*, 859 F.3d at 278, the District Court once again allowed the introduction of inadmissible evidence – over objection – on the issue of voluntariness.  (JA1832-1833).  Buried in a footnote, and after crediting the County with inadmissible evidence in its favor, the Court nevertheless acknowledged that there was a dispute as to voluntary nature of the work detail.[22] (JA1834, n.7).  The District Court recognized many of the ways in which incarcerees here – like traditional employees – had asserted their bargaining power over their working relationship with DPW, and that the facts *here* demonstrated more bargaining power than *Harker and Ndambi*.  (JA1834-1835).  Nevertheless, the Court totally ignored this great weight of evidence *in favor of the non-moving party*, because "the Fourth Circuit's strong language against the recognition of any inmate [b]argaining power necessitates that this Court view this factor as weighing against the application of the FLSA." (JA1835).  This is pure error of law.

---

[22]     In analyzing the issue of rehabilitative value of the work and the voluntary nature of the MRF work program, the District Court had an obligation to take the facts in the light most favorable to the Appellants "to determine the applicable questions of law and ignore any contrary factual claims, even if a 'jury could well believe the evidence forecast by the [Defendants].'"  *Franklin v. City of Charlotte*, 64 F.4th 519, 525 (4th Cir. 2023) (*quoting Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017)).

This Court should follow Judge Chasanow's simple yet correct observation: when work is optional and done for economic reasons, there is a "'bargained-for-exchange of labor' for mutual economic gain that occurs in true employer-employee relationship." *King v. Schrader*, No. CV DKC 16-3804, 2017 WL 3730335, at *4 (D. Md. Aug. 30, 2017).

### iii. The Incarcerees Worked To Maintain Minimum Standards.

Finally, if *Harker* has a third factor, i.e., whether the incarcerees have their minimum standard needs met (thus obviating any need for FLSA protection), such a factor logically proves too little and too much. It proves too little, because a worker's preexisting entitlement to basic subsistence does not necessarily absolve a hiring entity from complying with the FLSA. It proves too much because this factor would categorically exclude any incarceree working in any situation, including the inmates in *Watson*, which *Harker* emphasized was correctly decided. *Harker*, 990 F.2d at 136-37.

But if this factor is read fairly to generally determine whether inmates have financial needs akin to what workers "'have to purchase in a true employment situation[,]'" *Matherly*, 859 F.3d at 278 (quoting *Harker*, 990 F.2d at 133)), then the District Court nevertheless erred in applying the law and the facts. The whole point of CCP, according to the County, was to "provide for the family." (JA1210). Workers used their earnings, *just like traditional employees*, to purchase warmer

clothing and brought food to the MRF to supplement their meager lunch, and critically important, satisfy financial obligations outside of BCDC, like their rent and child support obligations.   (JA143, JA239, JA241, JA114, JA1351).

## CONCLUSION

For the foregoing reasons, the judgment should be vacated and this case should be reversed and remanded to the District Court for further proceedings.

## STATEMENT ON ORAL ARGUMENT

Oral argument is needed here because this complex case presents a matter of great public importance, because the policies underlying the FLSA "are tied to the national economy," *Vanskike*, 974 F.2d at 810, and the application of those policies to work performed by inmates outside of a prison, on a voluntary basis for a government entity who is engaged in a commercial market sales of products upon which inmates have serviced, is a question of first impression in this Circuit.  This case has generated interest in the community, the factual record is lengthy, and if affirmed, this case would create a clear conflict between U.S. Courts of Appeals.

Dated: Sept. 20, 2023                    Respectfully submitted,

                                       */s/ Howard B. Hoffman*
                                       Howard B. Hoffman, Esq.
                                       Jordan S. Liew, Esq.
                                       HOFFMAN EMPLOYMENT LAW, LLC
                                       600 Jefferson Plaza, Suite 204
                                       Rockville, MD 20852
                                       (301) 251-3752
                                       (301) 251-3753 (fax)
                                       hhoffman@hoholaw.com

                                       *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1. This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>12,835</u> words.

2. This document complies with the typeface requirements because:

    this document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

Dated: Sept. 20, 2023                    Respectfully submitted,

_/s/ Howard B. Hoffman_
Howard B. Hoffman, Esq.
Jordan S. Liew, Esq.
HOFFMAN EMPLOYMENT LAW, LLC
600 Jefferson Plaza, Suite 204
Rockville, MD 20852
(301) 251-3752
(301) 251-3753 (fax)
hhoffman@hoholaw.com

_Counsel for Appellants_