NO. 23-1731

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### MICHAEL A. SCOTT, et al.,

**Plaintiffs/Appellants,**

**v.**

### BALTIMORE COUNTY, MD,

**Defendant/Appellee.**

**On Appeal from the United States District Court for the District of Maryland
Case No. SAG-21-00034
(Honorable Stephanie A. Gallagher)**

---

**BRIEF OF APPELLEE**

---

Jeffrey T. Johnson
Kraig B. Long
Nelson Mullins Riley & Scarborough, LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
443-392-9460

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1731     Caption: Scott et al. v. Baltimore County, Maryland

Pursuant to FRAP 26.1 and Local Rule 26.1,

Baltimore County, Maryland
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date:    July 25, 2023

Counsel for: Appellee _____

Print to PDF for Filing

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE ...................................................................... 1

I.      The County's Motion for Summary Judgment Demonstrated
that Plaintiffs Were Not Employees as a Matter of Law ...................... 1

       A.     The County's Department of Corrections and
Community Corrections Program sought to assist inmates
with reintegration ...................................................................... 1

       B.     The County's Department of Public Works ("DPW")
operated the MRF as a public service to County residents ......... 6

       C.     The County sold recyclables to save landfill space and
reduce the burden on taxpayers ................................................. 6

       D.     The MRF detail served the rehabilitative aims of the
County ...................................................................................... 8

              i.     Inmates assigned to the MRF detail remained in
custody throughout their workday. .................................. 9

              ii.    Inmates were subject to removal from the MRF for
violation of the BCDC Code of Inmate Offenses .......... 11

              iii.   Inmates at the MRF worked separate from
temporary laborers. ....................................................... 12

              iv.   The MRF detail was used as a steppingstone to
work release or potential permanent employment. ........ 13

       E.     The MRF detail was suspended in response to the
COVID-19 pandemic ............................................................... 13

       F.     The County often operated the MRF at a loss and did not
obtain a competitive advantage from the MRF detail ............. 14

i

II.    The District Court Ruled that Plaintiffs Were Not Covered "Employees" Under the FLSA ........................................................... 16

    A.    The District Court conducted an exhaustive survey of how other circuit courts have analyzed inmate work under the FLSA ........................................................... 16

    B.    The District Court decided that *Harker* provided the correct framework for analysis of inmate employment under the FLSA ........................................................... 17

    C.    The District Court determined that Plaintiffs' custodial work did not fit within the traditional employment paradigm ........................................................... 18

SUMMARY OF THE ARGUMENT ........................................................... 21

ARGUMENT ........................................................... 24

    I.    Standard of Review ........................................................... 24

    II.    The District Court Correctly Relied Upon Binding Precedent Addressing Application of the FLSA in the Custodial Context ......... 27

    A.    The joint employment test from *Watson*, *Carter* and *Burrell* is limited to where an outside, private employer benefits from inmate work ........................................................... 27

    B.    *Harker* addressed the application of the FLSA to custodial detention and should not be arbitrarily limited to "within prison walls." ........................................................... 30

    III.    The District Court Appropriately Judged the Economic Realities of the MRF Inmate Work Detail ........................................................... 33

    A.    Plaintiff's work undisputedly furthered the rehabilitative interests of the County ........................................................... 33

    B.    Plaintiffs' work was not the product of a "bargained for exchange" ........................................................... 41

        i.    Inmates participated in the MRF detail at the prerogative of the DOC. ........................................................... 41

ii. Inmates remained in custody throughout the workday at the MRF. .......................................................42

iii. Inmates were powerless to bargain over essential terms of their work. .....................................................44

C. The legislative aims of the FLSA are not furthered by paying Plaintiffs a minimum and overtime wage .....................45

i. Plaintiffs received a minimum standard of living from the County. ...........................................................46

ii. The County obtained no unfair competitive advantage. .......................................................................49

iii. Plaintiffs ask the Court to intrude on the role of Congress in extending the FLSA to custodial detentions. .....................................................................51

CONCLUSION ...........................................................................53

CERTIFICATE OF COMPLIANCE ...................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986)......................................24, 25

*Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445 (4th Cir. 2021) ..................................................................33

*Bennett v. Frank*, 395 F.3d 409 (7th Cir. 2005)........................................29

*Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983) ..........................................................................16, 17, 18, 28

*Borkowski v. Balt. Cnty., Md.*, 414 F. Supp. 3d 788 (D. Md. 2019) ......................29

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987) ............................26

*Burrell v. Staff*, 60 F.4th 25 (3d Cir. 2023)
..........................................................................*passim*

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984)
..........................................................................*passim*

*Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256 (4th Cir. 1997) ........................26

*Harker v. State Use Indus.*, 990 F.2d 131 (4th Cir. 1993)
..........................................................................*passim*

*Henthorn v. Dep't of Navy*, 29 F.3d 682 (D.C. Cir. 1994)......................................32

*Howard v. City of Durham*, 68 F.4th 934 (4th Cir. 2023) ......................................38

*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462 (3d Cir. 2012)................................................................29

*Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) ..................................................31

*Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017)..................................18, 31, 46

*McFeeley v. Jackson St. Ent., LLC,* 825 F.3d 235 (4th Cir. 2016)........................33

iv

*Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021)
........................................................................................................*passim*

*Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369 (2019) ...............25, 26

*Peterson v. M.J.J., Inc.*, No. CV JKB-16-3629, 2017 WL 4098755 (D. Md. Sept. 13, 2017), *aff'd*, 720 F. App'x 702 (4th Cir. 2018) ...........................28

*Schultz v. Cap Int'l Sec.*, 466 F.3d 298 (4th Cir. 2006)...........................................33

*Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015) ...........................................................49

*Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985) ......................50

*Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992)
........................................................................................................*passim*

*VCA Cenvet, Inc. v. Chadwell Animal Hosp., LLC*, 552 F. App'x 217 (4th Cir. 2014)..............................................................................................25

*Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997) .........................................48

*Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990)
........................................................................................................*passim*

## Rules

Fed. R. Civ. P. 56(a)..................................................................................................25

Fed. R. Evid. 406 ......................................................................................................38

## Statutes

29 U.S.C. § 201 *et seq.*...............................................................................................1

29 U.S.C. § 202(a) ...............................................................................................21, 47

42 U.S.C. § 6901(a)(4)..............................................................................................50

N.C. Gen. Stat. § 148-26 (2023) ..............................................................................39

Md. Code Ann., Correctional Services § 3-502(2) (West 2023)..............................39

**Other Authorities**

DEP'T OF JUSTICE, A REVIEW OF FEDERAL PRISON INDUSTRIES'
ELECTRONIC-WASTE RECYCLING PROGRAM (October 2010) ............................53

H.R. 938, 111th Cong. (2009)...................................................................53

H.R. 2098, 113th Cong. (2013)................................................................53

H.R. 6293, 118th Cong. (2023)................................................................54

UNICOR, ANNUAL MANAGEMENT REPORT FISCAL YEAR 2022 (Nov. 15,
2022)………………………………………………………………………53

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the U.S. District Court for the District of Maryland ("District Court") erred in granting summary judgment on the grounds that inmates ("Plaintiffs") were not "employees" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, where Plaintiffs' work served the rehabilitative aims of Baltimore County, MD ("the County"), Plaintiffs' work bore all the hallmarks of custodial detention, and Plaintiffs' necessities of daily living were provided at substantial cost by the County.

## STATEMENT OF THE CASE

Plaintiff Michael Scott filed this action, claiming that he and other current and former inmates were "employees" under the FLSA while working at a County recycling facility during their incarceration between January 5, 2018, and January 5, 2021 ("the relevant period"). JA 39, JA 41-42. At the conclusion of discovery, the County moved for summary judgment. JA 25, JA 1805.

**I. The County's Motion for Summary Judgment Demonstrated that Plaintiffs Were Not Employees as a Matter of Law.**

The County's motion for summary judgment was supported by the following undisputed facts:

### A. The County's Department of Corrections and Community Corrections Program sought to assist inmates with reintegration.

During the relevant period, Plaintiffs were inmates at the Baltimore County Detention Center ("BCDC"), having been convicted of crimes ranging from theft

and burglary to possession of narcotics with intention to distribute to driving under the influence.  JA 342, JA 1182-1183, JA 1665.  BCDC fell under the purview of the County's Department of Corrections ("DOC")—one of several agencies within the County government.  JA 700-702.  The DOC's mission was to provide "public safety by confining pretrial detainees and sentenced offenders in a clean, safe and secure detention facility," and to also provide "self-improvement opportunities for community reentry."  JA 187-188 (with hyperlink to DOC's mission statement).

The DOC operated a Community Corrections Program.  JA 703, JA 940.  The purpose of the Community Corrections Program was to further the DOC's mission of "assist[ing] inmates with transitioning back into the community."  JA 955, JA 1135.  The Community Corrections Program supervised "inmates who were placed on home detention[,]" and oversaw inmates "recommended by the courts for work release[,]" or "assigned to work details."  JA 703, JA 705, JA 955.  Work opportunities were provided by the Community Corrections Program with the goal that inmates would not "return back to the facility," and were better prepared "to be a functioning person in the community[.]"  JA 1135-1136.

The Community Corrections Program was headed by a Community Corrections Supervisor responsible for overseeing the specific functions of the Community Corrections Program and managing its staff.  JA 940.  Included among the staff were Classifications Officers who were responsible for evaluating inmates

and determining eligibility for the DOC's rehabilitative work programs. JA 195-201, JA 712, JA 943, JA 960, JA 1096-1097, JA 1149-1153.

The Community Corrections' work programs included work release and work details. Inmates on work release were permitted to leave BCDC during the workday without the supervision of correctional officers to work for employers in the community—often an employer that the inmate worked for prior to being incarcerated. JA 956-958, JA 1104. Work release had to be approved in advance by an inmate's sentencing judge. JA 956. Community Corrections intended that inmates would maintain employment with their work release employers after their incarceration, further facilitating their reintegration upon release. JA 969.

The Community Corrections Program also managed several work details. JA 703, JA 705, JA 955. Work details allowed qualified inmates to work while incarcerated in an effort to prepare them "for reentry into the community." JA 705. However, unlike work release, inmates placed on a work detail worked for the County and remained under the constant supervision of correctional officers throughout the workday. JA 741-742. If an inmate performed well on a work detail, Community Corrections staff would write to the inmate's sentencing judge and request that the inmate be approved for work release. JA 958, JA 1108. To further facilitate the reintegration of inmates into the community, Community Corrections staff could later request that the inmate be transitioned from work release to home

detention, thereby allowing the inmate "some time in the community, in their actual home, to try to transition back [to the community.]"  JA 955-956, JA 958-959.

During the relevant period, the Community Corrections Program offered several work details, including working at the County's animal shelters, maintaining the front lobby of BCDC, loading and unloading shipments at the BCDC loading dock, maintaining the grounds outside and around BCDC, setting up for, or cleaning up after, events put on by the Baltimore County Chamber of Commerce, and sorting recyclables at the County's Materials Recovery Facility ("MRF").  JA 1226-1227.

The Community Corrections staff retained authority to determine whether an inmate was suitable for assignment to a work detail.  JA 198-201, JA 712, JA 970-974.  The Community Corrections staff could assign an inmate to a work detail, or conversely bar or prevent an inmate from participating in a work detail, based on the assessment of a variety of factors, including the inmate's criminal history and prior disciplinary infractions at BCDC.  JA 195-197, JA 712, JA 970-974.  Under DOC policy, sentenced inmates deemed eligible for a work detail were required to work and did not have the right to refuse to work or choose their particular work assignment.  JA 198-199, JA 1124-1125, JA 1180, JA 1241-1242.  An inmate's refusal to work was considered an institutional infraction under the DOC's Code of Inmate Offenses.  JA 251, JA 948-951.  Several Plaintiffs were subject to discipline at BCDC for this infraction.  JA 1767-1770.

4

Nonetheless, inmates were able to request a specific work assignment via an inmate request form (referred to as a "Form 118"). JA 199. Given the operational difficulties caused by assigning inmates to work details involuntarily, Community Corrections attempted to accommodate an inmate's request for assignment to a particular work detail where vacancies permitted. JA 950-953, JA 1125, JA 1180.

Inmates placed on the Community Corrections work details were paid a daily rate ranging from $1 per hour for assignment to the loading docks and front lobby at BCDC to $15 per day and $20 per day for assignment to the animal shelters or MRF, respectively. JA 73. In addition, inmates assigned to work details earned a reduction of their sentences, referred to as "industrial credits." JA 281-282, JA 284-287. The ability to earn industrial credits was one of the most common reasons provided by inmates, including Plaintiff Michael Scott, for desiring to be placed on a work detail. JA 961-962, JA 1632-1633. Inmates also received their room and board, three meals a day, healthcare, and medications free of charge[1] at an expense of approximately $40,000 per year to the County per inmate. JA 562-563, JA 729-730, JA 1271-1272, JA 1283-1285.

---

[1] Inmates incurred a $4 charge for visiting the BCDC infirmary, but inmates would not be denied access to medical care "due to a lack of funds" available to pay this $4 charge. JA 240.

**B. The County's Department of Public Works ("DPW") operated the MRF as a public service to County residents.**

The County considered recycling a "civic responsibility" and a "necessary, vital aspect of serving the citizens of Baltimore County." JA 568, JA 860. According to Frederick Homan, the County Administrative Officer for much of the relevant period, the County sought to recycle "as much capacity as possible" as part of "serving County residents." JA 582. The DPW, through its Bureau of Solid Waste Management, was responsible for managing the MRF, located in Cockeysville, MD, as the hub of the County's recycling operations. JA 102, JA 687.

In November 2013, Baltimore County converted the MRF from a dual stream recycling system—requiring residents to sort their recyclables by type (aluminum, paper, plastic, etc.)—to a single stream recycling system. JA 355-356, JA 626-627. Recyclables were delivered to the MRF by a network of hauling contractors engaged by the County. JA 103, JA 360-361. Recyclables received at the MRF underwent a system of automated and manual sorting, the latter of which was performed by personnel stationed at the MRF's system of conveyor belts. JA 362-364.

**C. The County sold recyclables to save landfill space and reduce the burden on taxpayers.**

During the relevant period, the County conducted a monthly online auction for the sale of the baled recyclables processed at the MRF. JA 377, JA 479. The County sold the bales to the highest bidder. JA 480-481. The proceeds from the

6

sale of recyclables were deposited into the County's general fund, and as a result, reduced the tax burden of County residents. JA 552, JA 906, JA 861, JA 1685. Funds deposited into the County's general fund were used to pay for a variety of government services, including community improvements, government buildings, public schools, fire and police departments, and the upkeep of streets, highways, and waterways in the County. JA 173-174. The recycling revenue deposited into the County's general fund also paid for the operations of the DOC and BCDC, "including, but not limited to, the wages of correctional officers employed by the County, and the provision of food, water, clothing, healthcare and housing to inmates… housed at BCDC." JA 174, JA 552.

While the County generated revenue from the sale of recyclables, the generation of profit was not the goal of constructing and operating the MRF. JA 572-574, JA 582. Rather, the County designed the MRF to effectuate its residents' interest in recycling, create a positive impact on the environment, provide tax-saving benefits for its residents, reduce the amount of materials being put in the County's landfill, and save non-renewable resources. JA 158, JA 173, JA 568, JA 581-582, JA 585, JA 588-591, JA 643-646, JA 690-691, JA 904, JA 1685. The County would have operated the MRF "whether it was going to simply break even, suffer a small loss, or make a profit." JA 172, JA 584.

**D. The MRF detail served the rehabilitative aims of the County.**

The inmate work detail at the MRF (hereinafter "MRF detail")—also referred to as the CAF or MES detail—was one of the Community Corrections' work details during the relevant period. JA 741. The MRF detail was the product of cooperation and coordination between the County's DOC and DPW, as directed by the County's Administrative Officer. JA 537-539, JA 542. Such "interagency cooperation" to achieve County objectives was a regular aspect of County governance. JA 537-538.

The County utilized inmates in connection with its recycling operations for more than thirty (30) years before the relevant period. JA 161, JA 614, JA 637-648, JA 708-709. Throughout the relevant period, Classifications Officers assigned only sentenced inmates to the MRF detail. JA 1182-1183. Inmates assigned to the MRF detail were paid $20 per day from the County's general fund. JA 73, JA 460-461, JA 552. Inmates worked at the MRF from 6:00 a.m. to 3:30 p.m. Monday through Saturday, with increased hours of 6:00 a.m. to 5:30 p.m. coinciding with when the MRF received an influx of recyclables around the holiday season. JA 272. During increased hours, the County paid inmates an attendance bonus of $20 for working an entire week (Monday through Saturday), and an additional $30 bonus for working two consecutive weeks. JA 272, JA 1231. Inmate pay for participation in the MRF detail, the number of inmates assigned to the detail, and inmate work schedules were frequently approved or decided by the County Chief Administrative Officer. JA

549-551, JA 622, JA 1696, JA 1716-1717. Inmates had no ability to negotiate different pay, work schedules or responsibilities. JA 1634-1635, JA 1650-1651, JA 944.

> ### i. Inmates assigned to the MRF detail remained in custody throughout their workday.

Inmates assigned to the MRF detail were woken up by a correctional officer in their housing unit, fed breakfast on a cart wheeled into their housing unit, and then permitted to access lockers assigned to them in their housing unit to change into civilian or "street" clothing. JA 1636-1639. Two correctional officers assigned to supervise the MRF detail would then meet the inmates, perform a head count, and escort the inmates on to the County-owned bus to be transported to the MRF. JA 55-56, JA 289, JA 720-721. Inmates were provided bag lunches from the BCDC kitchen when placed on the bus. JA 56, JA 725, JA 1637-1638. Once on the bus, the two correctional officers assigned to supervise the MRF work detail would perform a head count. JA 1640-1641, JA 289. Inmates were then directed to remain seated while they were driven from BCDC in Towson, MD to the MRF in Cockeysville, MD. JA 289, JA 1642.

Once the bus arrived at the MRF, the two correctional officers assigned to supervise the MRF detail would have all inmates exit the bus and perform an additional head count. JA 720-723, JA 56, JA 290. While the correctional officers remained at the MRF to handle all security and behavioral issues, staff affiliated with

DPW trained and instructed the inmates on their work assignments. JA 270-271, JA 290. On an inmate's first day of work at the MRF, the inmate would receive an orientation covering a variety of safety topics and how to perform the sorting tasks. JA 290, JA 393-395, JA 1643. Inmates were provided with necessary safety equipment, including safety goggles, reflective vests, hard hats, and safety gloves. JA 290, JA 1643. Inmates then went to the workstations on the recycling line to perform their sorting responsibilities. JA 420-421, JA 1643. Inmates who worked at the MRF were supervised by correctional officers at all times during the workday. JA 290, JA 1642, SA 71-73. Correctional officers "were always present[,]" and floated throughout the day. JA 290, JA 688. Correctional officers were instructed to "position themselves so that they [could] continuously monitor all inmate workers on the production line." JA 57, JA 720-723, JA 1170-1171.

Inmates at the MRF were instructed not to leave their workstation unless they had permission from one of the correctional officers. JA 1544-1545, JA 291. During breaks and lunch, inmates were advised that they were only permitted in the breakroom and the restroom at the MRF, and were not permitted to be present anywhere else. JA 291, JA 216-217. Inmates were aware that they were not free to leave the MRF, SA 72, and MRF staff were instructed to alert a correctional officer and call the police if an inmate attempted to leave. JA 443, JA 291.

At the conclusion of the workday, the same County-owned bus would transport inmates back to BCDC. JA 1652-1653, JA 291, JA 59. Any items brought back from the MRF by an inmate were prohibited and considered contraband. JA 59. Before boarding the bus to return to BCDC, inmates were frisked and searched. JA 291, JA 720-723, JA 59. Once at BCDC, inmates were strip searched and required to undergo a "breath alcohol screening." JA 1653-1654, JA 291, JA 720-723, JA 59, JA 315. After changing into their BCDC-issued uniforms, inmates were returned to the common area of their housing unit, where they would receive dinner prepared in the BCDC kitchen. JA 1654-1655.

> ii.   *Inmates were subject to removal from the MRF for violation of the BCDC Code of Inmate Offenses.*

Inmates were removed from the MRF detail if they were recommended for work release by their sentencing judge and obtained "outside employment" with a private employer. JA 1202. Inmates were also removed from the MRF detail if they received an "OIC" or "offense in custody," meaning that they were found guilty of a violation of BCDC's Code of Inmate Offenses. JA 1200-1201, JA 1177, JA 1771-1793. If an inmate was found guilty of an OIC by a disciplinary hearing officer (either at BCDC or the MRF), the inmate would be placed on a 60-day program hold, meaning that they could not participate in a work program for 60 days. JA 1167-1169. For example, Plaintiff Scott was removed from the MRF for several offenses in custody, including possessing suboxone in his assigned locker at BCDC. JA 319,

JA 1663, JA 1664.  Plaintiff Scott was also permanently removed from the MRF detail and placed in restrictive housing after he threatened another inmate while at the MRF.[2]  JA 320-321.

### iii. *Inmates at the MRF worked separate from temporary laborers.*

The County required 40-45 persons to perform manual sorting at the MRF during operating hours.  JA 630-631, JA 881.  However, the County was often unable to maintain this number of inmates on the MRF detail because of a lack of work eligible inmates at BCDC.  JA 332-333, JA 630-633, JA 1023, JA 1084.  This, in turn, resulted in the County engaging with temporary staffing companies to supply temporary workers to perform manual sorting at the MRF.  JA 522, JA 634-635.

Temporary workers and inmates were segregated to separate work areas at the MRF, told not to communicate, had separate supervisors, had separate break and restroom facilities, and were required to use separate exits from the MRF. JA 397, JA 434-436, JA 454-456, JA 1024, JA 531-532, JA 787-788.  Temporary workers were also not provided food like inmates, were responsible for their own transportation to and from the facility, and were required to provide their own outerwear and safety equipment.  JA 375, JA 397, JA 436, JA 437-438.  Given that

---

[2] Other inmates were also removed from the MRF detail.  JA 322-331.

temporary workers were not in the custody of the DOC, they were also not limited in their movements in the same manner as inmates. JA 531-532, JA 787-788.

> iv. *The MRF detail was used as a steppingstone to work release or potential permanent employment.*

Inmates assigned to the MRF detail were told by Community Corrections staff that, if they performed well at the MRF, there was a possibility that they could obtain employment at the MRF following their incarceration. JA 1224-1225. Starting in 2017 and continuing through the relevant period, the County hired six (6) inmates who participated in the MRF detail following their release from incarceration to work at the MRF. JA 334-335, JA 444-447. The County intended that the MRF detail would create a pathway to post-incarceration employment for inmates but had limited success in hiring inmates because of limited public transportation to the MRF. JA 603-605. Community Corrections Program staff also informed inmates that, if they performed well at the MRF, DOC would write to their sentencing judge and request that they be approved for work release (if not already approved). JA 1256. Numerous inmates were recommended for work release after assignment to the MRF detail. SA 23-63.

## E. The MRF detail was suspended in response to the COVID-19 pandemic.

On April 7, 2020, the Director of the DOC decided to suspend the MRF detail due to concerns about the transmission of COVID-19. JA 735-736. When the work

detail was first suspended, County employees who did not previously work at the MRF were reassigned to the MRF to work as sorters. JA 895. Then, in June 2020, the County began staffing the sorting positions at the MRF exclusively with temporary labor, and the County has maintained this arrangement at all times since. JA 521.

### F. The County often operated the MRF at a loss and did not obtain a competitive advantage from the MRF detail.

The County has publicized the revenue generated from operation of the MRF, and unsurprisingly sought to maximize the financial benefit to County taxpayers from the sale of recyclables. JA 576-577, JA 1681-1682. However, the County does not operate the MRF to generate a profit for shareholders or investors like a competitive business. JA 172, JA 584, JA 1001-1004. Further, while the County tracked the revenue generated from the sale of recyclables, it only performed a partial accounting of the expenses associated with operation of the MRF. JA 892, JA 173. Significant expenses like electricity and utilities, debt service, administrative support (legal, accounting, etc.), and fringe benefits for County employees were not accounted for as part of the operating expenses of the MRF. JA 173, JA 916-917. Consequently, the County never tracked the MRF's net revenue to determine profit (gross revenue minus expenses) like a private business. JA 173, JA 532-533.

Even a comparison of the partial expenses of the MRF against the County's revenue from the sale of recyclables reveals that the expenses associated with the MRF often exceeded the revenues obtained from the sale of recyclables. JA 579-580, JA 590-591, JA 174. The County's limited accounting reveals that, in fiscal years 2019, 2020 and 2021 (July 1, 2018, to June 30, 2021), the County operated the MRF at a loss in two of the three years:

| Fiscal Year | Revenue | Expenses Tracked by the County | Difference |
|---|---|---|---|
| 2019 | $4,380,153 | $4,572,291 | ($192,138) |
| 2020 | $3,173,680 | $4,136,820 | ($963,140) |
| 2021 | $7,016,469 | $4,495,898 | $2,520,571 |

JA 173-174, 176-177. The only fiscal year in this range with positive revenue (2021)—covering July 1, 2020, to June 30, 2021—is also the only fiscal year following the suspension of the MRF detail, meaning inmates were not involved in sorting recyclables at this time. JA 735-736. The County also continued its recycling operations unchanged following suspension of the MRF detail in April 2020, including accepting recyclables from Harford County. JA 104.

The County sought to avoid competing against private industry in its sale of recyclables. Specifically, the County never set the price for its recyclables or attempted to "undercut" the market by selling its recycled materials for less. JA 481-483. The County did not examine what other entities were selling their recyclables for when putting its own recyclables out to bid. JA 481-483. The County also did

not collect recycling from commercial businesses because it did not wish to compete with private sector entities who have contracted with County businesses. JA 852-857, JA 86, JA 613. The County simply sold its recyclables to the bidder who was willing to pay the most. JA 478, JA 490-491.

## II.    The District Court Ruled that Plaintiffs Were Not Covered "Employees" Under the FLSA.

On June 9, 2023, the District Court issued a 36-page Memorandum Opinion granting the County's Motion for Summary Judgment and ruling that Plaintiffs were not "employees" under the FLSA. JA 1839-1840. At the outset, the District Court stated that "the question is whether Plaintiffs' work conducted outside the prison's walls constitutes employment under the FLSA." JA 1813. Given that this Court had not yet addressed this question, the District Court thoroughly "review[ed] how other circuit courts have approached the legal question before proceeding to consider Plaintiffs' specific factual circumstances." JA 1813.

### A. The District Court conducted an exhaustive survey of how other circuit courts have analyzed inmate work under the FLSA.

The District Court noted that two early decisions on inmate coverage under the FLSA had applied a multi-factor joint employer "test" derived from the Ninth Circuit's decision in *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). JA 1816-1817 (citing *Carter v. Dutchess Cmty. Coll*., 735 F.2d 8 (2d Cir. 1984), and *Watson v. Graves*, 909 F.2d 1549, 1550 (5th Cir. 1990)).

However, the District Court observed that *Bonnette* was largely abandoned after the Seventh Circuit's decision in *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992), where the Seventh Circuit ruled that the question of whether an inmate was an employee was distinct from whether one or more entities was a joint employer. JA 1818. According to the District Court, *Vanskike* took a "more holistic" approach based on the underlying purposes of the FLSA to determine whether the work fit within a traditional understanding of employment. JA 1820. The District Court recognized that *Vanskike*'s rejection of the *Bonnette* factors proved to "be persuasive," as numerous circuits followed *Vanskike*, including this Court in *Harker v. State Use Indus.*, 990 F.2d 131 (4th Cir. 1993).[3] JA 1818-1820, JA 1821, JA 1823. The District Court observed that the only case to apply the joint employment analysis after *Vanskike* was the Third Circuit's decision in *Burrell v. Staff*, 60 F.4th 25 (3d Cir. 2023), where inmates worked at a recycling center operated by a private, third-party corporation. JA 1824-1825.

### B. The District Court decided that *Harker* provided the correct framework for analysis of inmate employment under the FLSA.

The District Court noted that Plaintiffs and the County disagreed about which legal framework should govern the case at bar, with the County advocating for

---

[3] The District Court noted that this Court applied the same analysis in *Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017), and *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021).

*Harker*, and Plaintiffs relying on "the decisions of *Watson*, *Carter*, and *Burrell*[.]" JA 1826. The District Court ultimately looked to *Harker*, reasoning, like *Vanskike*, that "inmate work programs—inside or outside the prison—involve a degree of control unlike typical employment relationships." JA 1827. The District Court further distinguished *Burrell* and other joint employment cases as limited to inmates working for a private third-party employer: "the *Bonnette* factors address a distinct question – whether multiple entities are joint employers of plaintiffs, which was relevant in cases such as in *Carter*, *Watson*, and *Burrell*, but is not relevant here as there is no private third-party employer." JA 1827.

### C. The District Court determined that Plaintiffs' custodial work did not fit within the traditional employment paradigm.

Based on *Harker*, the District Court analyzed "(1) the purposes of Plaintiffs' work program, (2) the nature of the working relationship between Plaintiffs and Defendant, and (3) the purposes of the FLSA" to determine whether Plaintiffs' work fit within the traditional understanding of employment. JA 1827.

First, the District Court stated that "evidence in the record demonstrates that DOC operated the work detail program for rehabilitative purposes and to provide structure to the inmate's day." JA 1827. The District Court observed, *inter alia*, that several DOC officials had testified as to the focus on reintegration of inmates following their release from BCDC. JA 1827-1828. The District Court noted that these interests were evident from the undisputed facts that inmates were

recommended for work release after assignment to the MRF detail, worked in exchange for time off of their sentences, and were hired to work at the MRF after their incarceration. JA 1827-1828. Conversely, the District Court acknowledged Plaintiffs' evidence that the County had sought to increase the revenue from the sale of recyclables, and had set a quota of inmates to work at the MRF to ensure "operating efficiency" of this facility. JA 1829-1830.

Nonetheless, the District Court determined that there was no "factual dispute" regarding the rehabilitative aims of the MRF detail, as "[d]espite Plaintiffs' evidence of the County's economic motivations, the program provided structure to inmates' days, provided inmates with work experience, provided pay (albeit very little) to inmates, and provided other benefits, such as institutional credits for time served— all of which demonstrate a rehabilitative purpose." JA 1831. The District Court noted that the County's "economic incentives" in operating the MRF did not "eliminate the non-pecuniary goals" of operating the MRF detail under *Ndambi*, holding that the "nonemployee-status of detainees is not altered by the private, for-profit nature of the detention facility." JA 1831 (emphasis added).

Concerning the next factor under *Harker*—the nature of the working relationship—the District Court noted that other cases had considered "the involuntariness of the work, examining whether Plaintiffs have the ability to walk off the job site or negotiate." JA 1832. On this factor, the District Court noted that

the County's policies indicated that inmates did not have a choice on whether to work, but, in practice, the County had "accounted for inmates' work preferences when determining work detail assignments." JA 1833. However, the District Court observed that this Court had been skeptical of inmates' negotiating power, again citing to *Ndambi* for the proposition that "the mere voluntariness of participating in a work program or the transfer or money between a detainee and detainer does not manufacture a bargained-for-exchange of labor." JA 1834-1835. The District Court stated that, in this case, as in *Harker*:

> DOC wields virtually absolute control over [the inmates] to a degree simply not found in the free labor situation of true employment. Inmates may voluntarily apply for [work detail] positions, but they certainly are not free to walk off the job site and look for other work. When a shift ends, inmates do not leave DOC supervision, but rather proceed to the next part of their regimented day. [The parties] do not enjoy the employer-employee relationship contemplated in [FLSA], but instead have a custodial relationship to which the Act's mandates do not apply.

JA 1835 (citing *Harker*, 990 F.2d at 133). Thus, the District Court concluded that this Court's "strong language against the recognition of any inmate bargaining power necessitates that th[e] [District] Court view this factor as weighing against the application of the FLSA." JA 1835.

Finally, the District Court turned to the underlying purposes of the FLSA: 1) the correction of labor conditions that are "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers[,]" and 2) the prevention of "unfair competition in commerce from the

use of underpaid labor." JA 1835-1837 (quoting 29 U.S.C. § 202(a)). Regarding the former, the District Court noted that the inmates were "entitled to the provision of food, shelter, medicine and other necessities" from the County, and therefore did not need a minimum or overtime wage to "maintain their 'standard or living' or 'general well-being.'" JA 1835. Concerning the latter, the District Court commented that the present case was unlike those where detainees had created an unfair competitive advantage while working for "private, third-party entities." JA 1837 (citation omitted). The District Court decided that, unlike cases benefiting a private third party, "any economic advantage attained by DPW through the work detail program flowed up to the County, and in turn, financed BCDC and its inmates." JA 1838. Thus, the economic benefit to the County did not merit application of the FLSA, as "[a] governmental advantage from the use of prisoner labor is not the same as a similar low-wage advantage on the part of a private entity: while the latter amounts to an unfair windfall, the former may be seen as simply paying the costs of public goods—including the costs of incarceration." JA 1839 (quoting *Vanskike*, 974 F.2d at 811-12).

## SUMMARY OF THE ARGUMENT

Plaintiffs incredibly fault the District Court for relying on the only binding precedent from this Court in *Harker* and subsequent decisions to address the FLSA in custodial situations. Plaintiffs further assert that that the District Court improperly

resolved disputes of fact in deciding their custodial work was unlike the traditional employment paradigm.

Plaintiffs arbitrarily limit the reasoning of *Harker* and related cases to "behind prison walls[,]" and liken this case to inmate work for private, third-party employers in *Watson, Carter* and *Burrell*. Plaintiffs' Br. 29. However, Plaintiffs overlook that *Watson*, *Carter* and *Burrell* are inapplicable where, as here, inmates are detained by and working exclusively for a local government. Plaintiffs also fail to provide any principled justification for limiting the reasoning of *Harker* to within prison walls, and ignore this Court's recent emphasis that the custodial context is itself inconsistent with the "traditional employment paradigm" covered by the FLSA, without any regard for the physical location of the work. *Ndambi*, 990 F.3d at 371.

The District Court further applied the reasoning from *Harker* and *Ndambi* in a thorough analysis, demonstrating the absence of any material factual dispute on whether Plaintiffs were working within the traditional employment paradigm. First, the County undisputedly demonstrated that the overarching purpose of all work details administered by the County's DOC— including the MRF detail—was to prepare inmates for reintegration upon their release. Plaintiffs were unable to dispute the County's non-pecuniary aims, and instead focused almost exclusively on the general "commercial operations" of the MRF, and the County's efforts to obtain a sufficient number of workers—whether inmates or otherwise—to sort recyclables

at the MRF. Yet, Plaintiffs ignore that the MRF's focus on revenue as a facility designed to sell recyclables is separate from whether the County intended that the work performed by Plaintiffs at the MRF would assist with rehabilitation. Indeed, under this Court's ruling in *Ndambi*—where inmates were detained by and working for a for-profit corporation that had contracted with the Federal Government—the County did not sacrifice its rehabilitative aims by having inmates work at a facility that also generated revenue to pay for public goods. *Ndambi*, 990 F.3d at 374.

Second, Plaintiffs did not remotely demonstrate a "'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship." *Harker*, 990 F.2d at 133. Rather, Plaintiffs undisputedly participated in the MRF detail at the prerogative of correctional officers, remained in the custody of correctional officers throughout their workday, and had no ability to "to deal at arm's length" over issues like pay, work schedule, or promotions, as in a traditional employment paradigm. *Ndambi*, 990 F.3d at 372.

Finally, payment of a minimum and overtime wage to Plaintiffs would not vindicate the legislative aims of the FLSA of preventing "unfair competition" or allowing workers to maintain a minimum standard of living. Rather, the County demonstrated that it deliberately avoided competition with private recyclers and used all revenue from selling recyclables to pay for public goods, including the costs of Plaintiffs' own incarceration. *See Vanskike*, 974 F.2d at 811-12 (distinguishing

between the competitive advantage obtained by a private party via inmate workers and a government entity "paying the costs of public goods—including the costs of incarceration."). Further, Plaintiffs did not require a minimum wage to maintain a standard of living, which was provided at substantial cost by the County.

The County therefore respectfully requests that the judgment of the District Court be AFFIRMED.

## ARGUMENT

### I. Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing th[e] motion." *VCA Cenvet, Inc. v. Chadwell Animal Hosp., LLC*, 552 F. App'x 217, 219 (4th Cir. 2014). "By its very terms, [the standard for summary judgment] provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of <u>material</u> fact." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48 (1986) (emphasis in original). "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

While a court ruling on a motion for summary judgment must resolve all factual disputes in favor of the non-moving party, the determination of "whether a worker is an employee for FLSA purposes is a question of law" subject to *de novo* review. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 377 (2019) (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987)); *see also Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir. 1997) (although the existence of undisputed facts and their significance as to whether an employment relationship existed was "vigorously debated, resolution of that debate is a question of law.").

Thus, "summary judgment on FLSA employee status can be granted when "'there are facts pointing in both directions', []so long as they do not generate a genuine dispute of material fact." *Parrish*, 917 F.3d at 380 (citation omitted).  For example, in *Parrish*, the Court reviewed a lower court's summary judgment ruling that several plaintiffs were employees under the FLSA, rather than independent contractors. *Id.* at 375.  In analyzing the plaintiffs' status as independent contractors, *Parrish* applied a multi-factor "economic realities" test and determined that there were undisputed facts "pointing in both directions" on each of the pertinent factors. *See, e.g., id.* at 381 (analyzing the "degree of control" over the work performed and

noting that plaintiffs were "free to accept or reject any project" and "controll[ed] the manner and method of their work[,]" yet were required to comply with "company policies and procedures," undergo drug testing and safety training, and report to job sites by the time established by the company.).

Nonetheless, *Parrish* made its own *de novo* determination as to each factor, holding that undisputed evidence of "control" cited by plaintiffs was insufficient, on balance, to defeat independent contractor status. *See id.* at 382 (ruling that, although "safety training and drug testing is an exercise of control in the most basic sense of the word, . . . and something our court has considered previously, . . . it is not dispositive in this action because of the nature of the employment.") (citations omitted). The Court in *Parrish* even reversed the lower court, and granted summary judgment in favor of the company, while acknowledging that at least one of the relevant factors—"the extent of the relative investments of the worker and the alleged employer"—weighed in favor of the plaintiffs. *Id.*

Thus, although the District Court could not resolve <u>disputes of fact</u> in favor of the County, it was not required to deny summary judgment upon finding that some undisputed facts cited by Plaintiffs favored "employee" status. The District Court was tasked with making a legal judgment based on the totality of the undisputed evidence, which this Court reviews *de novo*.

## II.    The District Court Correctly Relied Upon Binding Precedent Addressing Application of the FLSA in the Custodial Context.

The District Court conducted a comprehensive survey of the ways in which this Court and others have analyzed inmate coverage under the FLSA before deciding on *Harker* as the appropriate framework for analyzing Plaintiffs' claims. Plaintiffs nonetheless argue that the District Court's application of *Harker* "directly collides headfirst into [*Burrell*,]" Plaintiffs' Br. 23, and that *Harker* was limited to inmates working inside of a prison. Plaintiffs' Br. 29. Plaintiffs overlook the distinguishing involvement of a private employer in *Burrell*, and arbitrarily limit *Harker* to work within a prison.

### A. The joint employment test from *Watson*, *Carter* and *Burrell* is limited to where an outside, private employer benefits from inmate work.

Plaintiffs characterize *Burrell* as a "nearly indistinguishable case which held that incarcerated workers at a county recycling facility in Pennsylvania were covered FLSA employees." Plaintiffs' Br. 23. Yet, as recognized by the District Court, the joint employment analysis in *Burrell* was highly dependent upon the fact that <u>the county government had "outsource[d] the operation of its Recycling Center" to a private corporation</u>. 60 F.4th at 31 (emphasis added). Indeed, *Burrell* repeatedly stressed that the plaintiffs' work was done for the benefit of the "public-private partnership" or "venture" between the county government and private corporation. *Id.* at 44, 45, 47. *Burrell* therefore relied heavily on *Watson*, "which held that the

FLSA applied to convicted inmates allowed to work for a private construction company outside of the jail." *Id.* at 44 (citing 909 F.2d 1549, 1553-56 (5th Cir. 1990)) (emphasis added). The Court noted that—like *Watson*—"the Corporation … competed with other local and regional recycling facilities[,]" "the Corporation[] got an unfair advantage in the form of nearly free labor," and that a "private corporation" benefited from the plaintiffs' labor. *Id.* at 47-48 (emphasis added).

Based on the involvement of the outside corporation, *Burrell* applied the multi-factor joint employment test adopted by the Third Circuit to evaluate the "economic reality" of the plaintiffs' situation. *Id.* at 43 (*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 467 (3d Cir. 2012)). Although this test is more detailed than *Bonnette*, it similarly judges whether the purported joint employer is performing typical prerogatives of an employer, such as hiring and firing, setting work rules, and performing day-to-day supervision. *Id.*

*Burrell* logically flows from the established and uncontroversial holding that inmates are not excluded from coverage under the FLSA while working for a private third-party employer, such as on work release. *Cf. Peterson v. M.J.J., Inc.*, No. CV JKB-16-3629, 2017 WL 4098755, at *2 (D. Md. Sept. 13, 2017), *aff'd*, 720 F. App'x 702 (4th Cir. 2018) (ruling that "prisoners on work release" from BCDC and working as "hourly tipped employees" at a private deli were employees of the deli under the FLSA); *Bennett v. Frank*, 395 F.3d 409, 410 (7th Cir. 2005) ("We have no

quarrel with *Watson*[], or *Carter*[], which hold that the FLSA applies to prisoners working for private companies under work-release programs."). As recognized by Plaintiffs, even *Vanskike* agreed that the FLSA may well apply in cases "of a private, outside employer using the labor of prisoners[,]" as in *Watson* and *Carter*. Plaintiffs' Br. 31 (citing *Vanskike*, 974 F.2d at 812). *Burrell*, however, cannot provide the appropriate legal framework where, as here, work is performed solely for a local government that is also charged with the inmates' incarceration.

While Plaintiffs contend that inmates were "made available" to the County's DPW in an effort to liken this case to *Watson*, *Burrell*, and *Carter*, Plaintiffs overlook that DPW is not a separate legal entity like the private businesses in those cases. *Borkowski v. Balt. Cnty., Md.*, 414 F. Supp. 3d 788, 804 (D. Md. 2019). The DPW is merely an arm of the County government, which collaborated with the DOC to achieve County objectives subject to the direction and oversight of the County Chief Administrative Officer. JA 520, JA 537-539, JA 542. Indeed, County Chief Administrative Officer Homan decided, *inter alia*, that inmates would work at the MRF, decided how many inmates would be assigned to the MRF detail, and decided how much said inmates would be paid. JA 549-551, JA 1716, JA 257, JA 469, JA 514, JA 527, JA 638. Thus, there remains a single entity—the County—which was both Plaintiffs' custodian and also controlled the terms and conditions of Plaintiffs' work. Application of the joint employer factors from *Watson*, *Burrell*, and *Carter*

is therefore ill-suited to the case at bar, as the County is necessarily controlling those inmates it detains. *Harker*, 990 F.2d at 133. As observed in *Vanskike*, the problem in cases such as this is that "there is <u>too much</u> control to classify the relationship as one of employment." *Vanskike*, 974 F.2d at 810 (emphasis in original).

## B. *Harker* addressed the application of the FLSA to custodial detention and should not be arbitrarily limited to "within prison walls."

In recognition of the unique circumstances of incarceration and the unprecedented level of "control" exercised over inmates, *Harker* held that Congress did not intend for FLSA coverage based on three considerations, applied by the District Court here. 990 F.2d at 133. However, Plaintiffs refer to *Harker's* explanation for why the FLSA did not apply as *dicta*, therefore incredibly limiting *Harker's* precedential value to the "first paragraph" of the Court's opinion. Plaintiffs' Br. 28-29.

Plaintiffs are obviously mistaken in their understanding of *dicta*, which this Court has defined as a "'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding[.]'" *Lennear v. Wilson*, 937 F.3d 257, 273 (4th Cir. 2019) (citation omitted). Of course, this Court's explanation for <u>why</u> Congress did not intend for the FLSA to apply in *Harker* is precisely an "analytical foundation" for the Court's holding. The Court

stated as much in *Matherly*: "[w]e based [the *Harker*] decision on three considerations." *Matherly*, 859 F.3d at 278 (emphasis added).

Plaintiffs not only improperly refer to *Harker's* reasoning as *dicta*, but fail to provide any principled explanation for why the reasoning of *Harker* should be limited to "within a prison." While *Harker* admittedly concerned work within the prison, *Harker* highlighted how the custodial context drastically differs from the "traditional employment paradigm." 990 F.2d at 133. The supporting reasoning of *Harker*—such as the inability of inmates to "walk off the job site and look for other work"—is undoubtedly relevant to any plaintiff in custody, and unaffected by the arbitrary distinction of whether the work occurs within prison walls. *Id.*; *see Henthorn v. Dep't of Navy*, 29 F.3d 682, 685 (D.C. Cir. 1994) (deciding "that the locus of the worksite is not, by itself, determinative of whether the FLSA applies.").

Indeed, this Court's decision just two years ago in *Ndambi* stressed that the fact of custodial detention—rather than the locus of the work—was the fundamental underpinning of both *Harker* and *Matherly*. 990 F.3d at 374 ("Neither *Harker* nor *Matherly* turned on the reason for the custodial detention but rather the fact of it."). *Ndambi* held that it was the province of Congress, not the courts, to extend the FLSA to "custodial detentions," and further that this Court and other circuits had "concluded that the FLSA's protections do not extend to the custodial context generally." *Id.* at 373, 375. Contrary to Plaintiffs' characterization of *Harker* as a

mere categorical exclusion of inmates "laboring in a prison," *Ndambi* cited extensively to *Harker* to demonstrate how "custodial detentions" differ from the "traditional employment paradigm," without any mention of the location of the work. *See generally* 990 F.3d 369. The District Court therefore appropriately applied the only binding precedent from this Circuit to yet another case involving custodial detention.

Plaintiffs nonetheless attempt to avoid this precedent on appeal, arguing that that the District Court was required to examine the totality of the circumstances based on precedent with no relation to the custodial context at all. Plaintiffs' Br. 33-36 (citing *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc*., 856 F. App'x 445, 451 (4th Cir. 2021), *McFeeley v. Jackson St. Ent., LLC,* 825 F.3d 235, 239 (4th Cir. 2016), and *Schultz v. Cap Int'l Sec.*, 466 F.3d 298, 304 (4th Cir. 2006)). However, Plaintiffs' discussion of these cases only seeks to divert the Court's attention away from the crucial fact of custodial detention, which is itself highly relevant to whether work fits within the "traditional understanding of employment."

In fact, *Harker* and *Ndambi* asked the very same question as *Armento* and the other cases cited by Plaintiffs, but stressed that custodial detention was itself inconsistent with the "traditional employment" paradigm addressed by the FLSA. *Harker*, 990 F.2d at 133 ("SUI and Harker do not enjoy the employer-employee relationship contemplated in the Act, but instead have a custodial relationship to

which the Act's mandates do not apply."); *Ndambi*, 990 F.3d at 372 ("Persons in custodial detention—such as appellants—are not in an employer-employee relationship but in a detainer-detainee relationship that falls outside [the traditional employment] paradigm."). The District Court's discussion of Plaintiffs' incarceration therefore did not rely upon "mechanical" or "technical labels" as asserted by Plaintiffs, but simply a discussion of recognized distinctions of custodial work from the scenario of free market employment addressed by the FLSA.

## III. The District Court Appropriately Judged the Economic Realities of the MRF Inmate Work Detail.

Here, the District Court appropriately judged the economic realities of Plaintiffs' work in light of the unique circumstances of custodial detention recognized in *Harker*, *Ndambi* and *Vanskike*. Plaintiffs provide no basis to attribute error to the District Court's legal judgment.

### A. Plaintiffs' work undisputedly furthered the rehabilitative interests of the County.

Plaintiffs frame the first relevant consideration to their employment status as whether the "primary purpose of the work is rehabilitative . . . or is the predominate purpose of the work commercial?" Plaintiffs' Br. 37. This is a slightly different way of asking the same basic question as *Ndambi* and *Harker*, which was whether the work was intended to further the custodian's "non-pecuniary goals," such as "rehabilitation and job training." *Ndambi*, 990 F.3d at 374; *Harker*, 990 F.2d at 133.

Here, as noted by the District Court, the County provided testimony from numerous County officials that its Community Corrections work details in general— and the MRF detail in particular—were intended to further the rehabilitative aims of the County and the DOC.[4]  JA 187-189, JA 609, JA 961, JA 1020-1021, JA 1210, JA 1261-1262, JA1268-1269, JA 1270, JA 1278, JA 1135-1136.  These non-pecuniary aims included, but were not limited to, providing inmates experience, discipline and structure by working a regimented shift, learning about recycling operations, taking direction from a supervisor, waking up early to be at the detail, and simply avoiding the idleness associated with inmates remaining in their housing units at BCDC.[5]  County Chief Administrative Officer Homan further testified that

---

[4] Plaintiffs object to the District Court's consideration of this testimony as inadmissible lay testimony because the County's witnesses were not "experts in a sociological or psychiatric field" and had no "first-hand knowledge of empirical evidence that work at the MRF reduce[s] recidivism." Plaintiffs' Br. 52.  Plaintiffs, however, misconstrue the relevant inquiry for FLSA coverage as whether the work empirically or in fact achieved some rehabilitative effect.  In fact, courts focus only on the defendant's purpose or intent to further non-pecuniary aims like rehabilitation or the avoidance of idleness. *See, e.g., Ndambi*, 990 F.3d at 374 (emphasizing the "goals" or "aims" of the voluntary work program, rather than its actual success in serving a non-pecuniary purpose).  The District Court therefore appropriately ruled that numerous County witness—many of whom were longstanding correctional officials charged with administration of the DOC work programs—were competent to testify on the rehabilitative aims of the programs they administered.   JA 1828 ("[T]estimony regarding the prison's purpose in designing a work detail program does not require expert opinion.").

[5] Plaintiffs mischaracterize the record to argue that the County admitted that "the purpose of the work was to sort recyclable materials, not to rehabilitate MRF detail workers." Plaintiffs' Br. 38.  The testimony cited in support of this assertion reveals

he sought to create a pathway to post-incarceration employment for inmates at the MRF, resulting in the County hiring six (6) inmates as full-time employees following their release. JA 334-335, JA 444-447, JA 603-605.

Moreover, the evidence of the County's rehabilitative aims was not limited to "labels" or witness testimony, notwithstanding Plaintiffs' misleading assertion that the County could not identify any documents supporting its rehabilitative aims.[6] Plaintiffs are aware of numerous documents corroborating the rehabilitative aims of the County and distinguishing this case from the traditional employment paradigm.

As a preliminary matter, the rehabilitative aims of the County were bolstered by DOC's mission statement of providing "self-improvement opportunities for community reentry[,]" JA 187-188, which is distinguishable from the aims of a typical employer. However, the most notable distinction of Plaintiffs' work from the traditional employment paradigm was the undisputed documentation of the County providing inmates time off of their sentences in exchange for their work. JA 280-287. As confirmed by Plaintiffs and the former Community Corrections

---

only that County's corporate designee agreed during deposition that the purpose of the MRF facility was to "handle the recyclables of Baltimore County[,]" without any mention of the purpose served by the MRF detail. JA 687-688, JA 1277-1278.

[6] To support this assertion, Plaintiffs cite to the deposition testimony of a single witness who testified that he specifically had not reviewed any documents evidencing the rehabilitative interests of the County in preparing for a deposition. Plaintiffs' Br. 38 (citing JA 1026-1027).

Supervisor, these "industrial credits" were the most common motivation for inmate work. JA 961-962, JA 1632-1633, JA 1804. Of course, inmates working in exchange for an earlier release date is materially distinguishable from the motivations of a worker in a free market economy. This exchange is also *per se* rehabilitative and non-pecuniary, quite literally expediting an inmates' reintegration into the community.

The evidence of the County's rehabilitative motives was further corroborated by undisputed evidence that the Community Corrections Program used the MRF detail (like all other work details) as a steppingstone towards work release. Specifically, the Community Corrections Supervisor during the relevant period testified that Community Corrections staff would write to an inmate's sentencing judge and request approval for work release after a period of positive performance on a work detail. JA 1108. The County corroborated this testimony with a significant sampling of letters written to sentencing judges on behalf of Plaintiffs,[7] as well as testimony from the Plaintiffs themselves. *See* SA 73 (Plaintiff Michael Wells testifying that he was similarly able to work at the MRF detail for 1-2 months

---

[7] *See* SA 16-63. Plaintiff Dakota Barnard was assigned to the MRF detail on August 25, 2018, and the Community Corrections Supervisor wrote his sentencing judge a letter on October 3, 2018, requesting approval for work release. JA 336-340. In addition, Plaintiff Adam Dulaj was assigned to the MRF detail on November 30, 2018, and the Community Corrections Supervisor sent a letter to the Baltimore County Circuit Court on December 4, 2018, requesting work release approval. JA 341-342, SA 16-22.

and thereafter obtained a work-release job at a local market). Plaintiffs did not generate a material factual dispute regarding this practice of recommending work release, and relied only on fanciful evidentiary objections,[8] and misguided anecdotal assertions from two plaintiffs allegedly deprived of work release positions.[9]

---

[8] Plaintiffs argue that "the District Court improperly allowed Federal Rule of Evidence [(FRE)] 406 (habit) evidence to support the County's claim that the MRF detail was a 'steppingstone'" towards work release. Plaintiffs' Br. 52-53. However, the County never relied on evidence of habit under FRE 406, defined as "[e]vidence of a person's habit or an organization's routine practice [used] to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." *Howard v. City of Durham*, 68 F.4th 934, 950 (4th Cir. 2023). Rather, the County provided direct evidence that, in this particular case, numerous Plaintiffs were recommended for work release. JA 336-342, SA 16-63. Moreover, the Community Corrections Supervisor during the relevant period—who also drafted nearly all of the letters requesting work release approval—bolstered this anecdotal evidence with unequivocal testimony that "we would write the judge and ask the judge for a [work release] recommendation." JA 1107. Thus, even if FRE 406 did apply, it was clearly satisfied, as this Court has stated that "a witness's direct testimony of his general practice . . . [is] sufficient proof that a practice occurred on a particular occasion." *Howard*, 68 F.4th at 951

[9] Plaintiffs claim that "the County denied private work release recommendations from county judges to the economic detriment of Harold Snyder and others." Plaintiffs' Br. 50. However, Plaintiffs overlook that inmates approved for work release were not assigned to work release by the County, but permitted to make their own arrangements for outside employment. JA 1105, JA 968-969, JA 1140-1143. Here, Mr. Snyder admitted during deposition that he never talked to anyone at the Baltimore City Fire Department ("BCFD") about continuing his safety sensitive work as a firefighter after his Fourth DUI conviction. JA 1747-1750. Mr. Snyder further stated to police when arrested for his fourth DUI that he "could not get locked up again or 'I'm done' meaning he would lose his job." JA 1756. Even Plaintiff Dulaj, who also alleges he was denied work release, was in fact recommended for work release just days after he was assigned to the MRF detail. *See* fn. 7, *supra*.

Plaintiffs further failed to dispute the County's rehabilitative aims, and relied on extraneous facts, which they continue to assert on appeal. First, Plaintiffs allege that there was no "valuable skills learned" from the MRF detail because of the unskilled labor involved. Plaintiffs' Br. 38. However, *Harker* and *Ndambi* recognized nearly identical non-economic aims of inmate work without any discussion of the particular tasks performed. *See Harker*, 990 F.2d at 133 ("By producing useful goods in an atmosphere that mirrors the conditions of a true private employer, SUI helps prepare inmates for gainful employment upon release."); *Ndambi*, 990 F.3d at 370 (observing that the work program aims to "reduce[ ]" the "negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents[.]"). Indeed, numerous jurisdictions have recognized that providing work opportunities to inmates is beneficial to work habits and discipline, without any regard for the particular skills learned.[10] Without recognition of these non-rehabilitative aims, the court would confront a triable issue of fact on FLSA coverage each time an inmate merely questioned the skills learned

---

[10] *See*, *e.g.*, MD. CODE ANN., Correctional Services § 3-502(2) (West 2023) (establishing "Maryland Correctional Enterprises" to, *inter alia*, provide[] meaningful work experiences … intended to allow inmates to improve work habits, attitudes, and skills for the purpose of improving the employability of the inmates on release[.]"); N.C. GEN. STAT. § 148-26 (2023) ("Work assignments and employment shall be for the public benefit to reduce the cost of maintaining the inmate population while enabling inmates to acquire or retain skills and work habits needed to secure honest employment upon their release.").

from their assignment, such as the uncontroversial task of picking up trash on public roadways.

Plaintiffs further stress the evidence of quotas on the number of inmates assigned to the MRF detail, including the use of temps when the County could not assign an adequate number of inmates.[11]  Plaintiffs' Br. 38.  Yet again, however, these concerns have been squarely addressed by this Court in *Ndambi*, observing that "[t]he fact that [detention center] would have to hire nondetainees for such work without detainees' participation does not eliminate the non-pecuniary goals of the [work program]." *Ndambi*, 990 F.3d at 374.  Surely, if Plaintiffs were staffing the BCDC kitchen, library, or laundry—which Plaintiffs concede the FLSA does not cover—the County would be entitled to seek a minimum number of inmates to prepare the requisite number of meals, shelve returned books, or clean and fold the

---

[11] In discussing quotas, Plaintiffs assert that the County prevented "at least one MRF detail worker from attending the dentist to maintain his toil[,]" that the County "considered" Baltimore City inmates to work at the MRF, and that the County considered getting judges to sentence people to work at the MRF.  Plaintiffs' Br. 50.  Yet, Plaintiffs' repeated assertion that an inmate was prevented from attending the dentist is grossly exaggerated, as the email Plaintiffs cite for this proposition merely reveals that the dentist appointment was "moved one day" to accommodate an inmate's work.  JA 1221, 1718.  Further, Plaintiffs overlook that the sentencing of inmates to the MRF and the use of inmates from Baltimore City were merely referenced in stray documents, without any evidence that the County executed either proposal.  JA 836-837, JA 1070, JA 1702.

laundry without a pecuniary motive. Plaintiffs do not explain why the MRF detail should be analyzed any differently.

Finally, Plaintiffs focus on the revenue generated from the MRF, and assert that the District Court applied "technical labels" in finding that the County's economic incentives did not defeat the "rehabilitative value" of the MRF detail. Plaintiffs' Br. 39. Yet, Plaintiffs' argument again runs headfirst into *Ndambi*, where this Court specifically observed that detainee work at an immigration detention center operated by a for-profit corporation was not covered by the FLSA. 990 F.3d at 374. *Ndambi*, like the District Court here, acknowledged the "monetary aspect" of the plaintiffs' detention given the private, for-profit nature of the detention center, but maintained that the purpose of the plaintiffs' work and confinement was nonetheless non-pecuniary. *Id.*

The reasoning of *Ndambi* applies squarely to this case, as Plaintiffs were incarcerated by the County and undisputedly worked as part of the rehabilitative work details maintained by the DOC. Under the reasoning of *Ndambi*, the monetary aspects of the MRF's operations and the County's rehabilitative interests are not mutually exclusive. This is especially so where the County is seeking to generate tax savings for County taxpayers rather than benefit stockholders like a private corporation. JA 172, JA 584, JA 1001-1004. If the profit motives of a private corporation were insufficient to defeat the rehabilitative aims of the work in *Ndambi*,

then the fact that the County is looking to off-set the costs of public goods, <u>including the costs of Plaintiffs' incarceration</u>, should not defeat the County's rehabilitative motives in the case at bar.

### B. Plaintiffs' work was not the product of a "bargained for exchange."

This Court has recognized that the mere fact of custodial detention is inconsistent with the "bargained-for-exchange" necessary for FLSA coverage. *Ndambi*, 990 F.3d at 372 ("Those in custodial detention 'do not deal at arms' length.'"). However, Plaintiffs' attempt to demonstrate a "bargained-for-exchange" by asserting that the MRF detail was voluntary, that DOC exercised too little control over their work, and that "the District Court recognized many of the ways in which incarcerees here—like traditional employees—had asserted their bargaining power over the working relationship with DPW[.]" Plaintiffs' Br. 54. The County addresses each argument in turn.

### i. *Inmates participated in the MRF detail at the prerogative of the DOC.*

Plaintiffs' first contention about voluntariness was plainly rejected by this Court in *Harker*, deciding that voluntary participation in a work program did not create an employer-employee relationship, as "the inmates enroll in SUI programs solely at the prerogative of the DOC, which both initiates the programs and allows the inmates to participate." 990 F.2d at 133; *see also Ndambi*, 990 F.3d at 372

("While a detainee may choose whether or not to participate in a voluntary work program, they have that opportunity 'solely at the prerogative' of the custodian.").

Here, while Plaintiffs contend that participation in the MRF detail was voluntary, they cannot dispute that DOC exercised absolute control and discretion over their participation in the MRF detail, including initial assignment and removal. JA 195-201, JA 712, JA 943, JA 960, JA 1096-1097, JA 1149-1153. For example, Plaintiff Michael Wells testified that he was assigned to the MRF detail shortly after becoming incarcerated at BCDC without volunteering or even expressing interest in doing so. SA 66-70. Plaintiff Adam Dulaj also routinely emphasized throughout his deposition that he was "forced" to work at the MRF detail, and numerous Plaintiffs have stated they worked at the MRF "under protest." JA 828, JA 1348, JA 1414. Further, while DOC accounted for inmate preferences in assigning inmates to work details, inmates faced the possibility of discipline for refusal to work. JA 251, JA 948-951, JA 1767-1770. These circumstances are even more distinguishable from the traditional employment paradigm than *Harker*, where inmates underwent "a voluntary application and interview process." 990 F.2d at 132.

### ii. Inmates remained in custody throughout the workday at the MRF.

Plaintiffs next argue that inmates at the MRF were not subject to "the same level of custody" as inside the prison. Plaintiffs' Br. 41. However, the relevant inquiry is whether Plaintiffs' custodial situation is akin to the "free labor situation of

true employment," not whether it is akin to other custodial scenarios. In *Harker*, the Court observed that the plaintiff was in "a custodial relationship to which the [FLSA's] mandates do not apply" because "DOC wields virtually absolute control over [inmates] to a degree simply not found in the free labor situation of true employment." *Harker*, 990 F.2d at 133 (citation omitted). The Court further reasoned that inmates are not "free to walk off the job site and look for other work" and that, when an inmate's shift ends, they "do not leave DOC supervision, but rather proceed to the next part of their regimented day." *Id.* Similarly, in *Ndambi*, the Court observed that "[p]ersons in custodial detention . . . are under the control and supervision of the detention facility, which is simply not comparable to the 'free labor situation of true employment.'" *Ndambi*, 990 F.3d at 372 (citation omitted). Thus, in both cases, the Court was concerned with whether the level of control exercised over inmates was consistent with an employer-employee relationship, <u>not whether the level of custody was comparable to the restrictions placed on inmates in other custodial settings</u>.

Here, while Plaintiffs challenge how restrictive their custody was, they cannot dispute that the control exercised over them by correctional officers during their work was distinguishable from the "free labor situation of true employment." In particular, Plaintiffs do not dispute that 1) they were accompanied by correctional officers during their workday at the MRF (including transport to and from), 2) that

they would be reported to the police if they attempted to leave the MRF during their workday, 3) that their movement at the MRF was restricted to the recycling line, breakroom, and restroom, 4) that they required permission to leave the recycling line, and 5) that they were subject to headcounts and searches by correctional officers before, during, and after their workday. *See* pp. 9-11, *supra*; JA 1744-1745. Plaintiffs also do not dispute that they remained subject to BCDC's Code of Inmate Offenses while at the MRF, and could be removed from the MRF by a correctional officer for even minor infractions like possessing tobacco in a locker at BCDC. *See* pp. 11-12, *supra*. Thus, Plaintiffs were subject to too much control to be considered part of the "traditional employment paradigm" covered by the FLSA, even if Plaintiffs dispute the severity of their custodial detention. *Ndambi,* 990 F.3d at 372.

> ### iii. *Inmates were powerless to bargain over essential terms of their work.*

Finally, the District Court never recognized that Plaintiffs' bargaining power was akin to a free worker, and merely stated that "Plaintiffs have adduced enough undisputed facts to show they had more negotiating power than other inmate-labor cases where <u>hard labor constituted a part of the inmates' sentence</u>." JA 1834 (emphasis added). Yet, this Court has never required a sentence for hard labor to avoid application of the FLSA, as evidenced by the Court's discussion of voluntary work programs in *Harker*, *Matherly*, and *Ndambi*.

Furthermore, Plaintiffs never provided evidence that their bargaining power was akin to a worker in a free market economy, as they allege the District Court recognized. Quite to the contrary, the undisputed facts before the District Court were that all inmates were paid the same $20 per day, and that inmates had no ability to negotiate over items like schedule, pay, work hours, promotions etc. JA 1634-1635, JA 1650-1651, JA 944. At most, inmates complained – sometimes collectively – about the work or conditions at the MRF, no different than the common occurrence of inmates complaining about other aspects of their incarceration or accommodations at BCDC. JA 944-945, JA 1159. Notwithstanding frequent complaints, Plaintiffs conspicuously fail to mention any occasion where they were successful in bargaining over the terms of their work, akin to an employee negotiating their pay or work schedule with their employer. Plaintiffs' Br. 14-15; JA 944-945. Plaintiffs therefore improperly conflate complaints with the ability to "deal at arms' length." *Ndambi*, 990 F.3d at 372.

### C. The legislative aims of the FLSA are not furthered by paying Plaintiffs a minimum and overtime wage.

Plaintiffs argue that the legislative aims of the FLSA favor payment of a minimum and overtime wage because 1) the County has "spread employment" by ceasing the MRF detail and hiring temporary laborers, 2) because plaintiffs required a minimum wage to maintain a minimum standard of living, and 3) because the

County competed with other recyclers in the private marketplace.[12]   Plaintiffs' Br. 42-48.   As demonstrated below, Plaintiffs stretch the FLSA's stated purpose of providing for a "standard of living necessary for health, efficiency, and general well-being of workers" beyond recognition.  29 U.S.C. § 202(a).  Plaintiffs further assume an unfair competitive advantage based only on the existence of other private recyclers, while overlooking the crucial distinction between the County and such private businesses.  Plaintiffs lastly seek to extend the FLSA to the custodial context in light of various public policy concerns—a recognized prerogative of Congress, rather than the courts.

> i. *Plaintiffs received a minimum standard of living from the County.*

In *Harker*, the Court specifically observed that "Congress passed minimum wage standards in order to maintain a 'standard of living necessary for health, efficiency, and general well-being of workers.[,]'" and that "inmates have no such needs because the DOC provides them with the food, shelter, and clothing that

---

[12] Plaintiffs further contend on the basis of *Vanskike* that their involvement in "the national economy"—by sorting recyclables sold by the County—favors employee status.  Plaintiffs' Br. 40.  Yet, no Court has interpreted *Vanskike*'s observation that "Prisoners are essentially taken out of the national economy upon incarceration" to mean that prisoners are covered by the FLSA whenever touching a good or commodity sold by their custodian. 974 F.2d at 810.  *Harker* rather rejected a similar argument in connection with the FLSA's stated purpose of avoiding unfair competition, recognizing that congress had passed legislation to specifically address this concern in the Ashurst–Sumners Act.  990 F.2d at 134.

employees would have to purchase in a true employment situation." 990 F.2d at 133. Here, the same considerations undisputedly weigh against FLSA coverage, as Plaintiffs received their room and board, three meals a day, healthcare and medications at the County's expense. JA 240, JA 562-563, JA 729-730, JA 1271-1272, JA 1283-1285.

Plaintiffs attempt to escape this unavoidable reality by focusing on the FLSA's interest in "spreading employment," reasoning that the suspension of the MRF detail has created private sector jobs at the MRF. Plaintiffs' Br. 42-43. However, Plaintiffs' argument about the creation of private sector jobs merely reflects the unsurprising reality that, without the inmate work detail, someone must perform the sorting work at the MRF. More notably, this same reasoning about "spreading employment" could be used to invalidate <u>any</u> use of inmate work, despite the Thirteenth Amendment's exclusion of convicted inmates from the prohibition on involuntary servitude. *See Villarreal v. Woodham*, 113 F.3d 202, 206 (11th Cir. 1997). To be sure, in one of the emails cited by Plaintiffs, the DOC Director states that the "work detail pool is very limited" and that County employees were "maintaining our outside grounds and <u>performing other internal tasks as well</u>." JA 1705 (emphasis added). Yet, Plaintiffs do not allege competition between inmates and County employees for internal work at the BCDC laundry, kitchen, or barbershop, and do not contend that the FLSA's interest in "spreading employment"

requires application to BCDC's internal work details. Plaintiffs rather concede that these details are beyond the purview of the FLSA.

Plaintiffs further attempt to avoid the clear implications of *Harker* by asserting that they required a minimum wage to maintain a minimum standard of living to supplement their "meager" provisions from the County, and to pay for obligations like pets or children during their short-term sentences. Plaintiffs' Br. 47, 55-56. Yet, this Court has squarely rejected the plaintiffs' argument that inadequacy of the necessities provided by the County requires application of the FLSA:

> it is the jail's constitutional obligation to provide [a detainee] with his basic needs, including adequate food and drinkable water. When the jail fails to do so, it is that failure that must be remedied (the Constitution demands it); it does not entitle him to receive minimum wage under the FLSA.

*Ndambi*, 990 F.3d at 373 (citing *Smith v. Dart*, 803 F.3d 304, 314 (7th Cir. 2015)). Furthermore, an inmates' need to provide for children, pets or other responsibilities while incarcerated is unaffected by whether an inmate is sentenced to several months or several years of incarceration. As recognized by the District Court, these obligations are further distinguishable from the "atypical" need for a minimum wage in *Burrell*, where the Court noted that inmates required a minimum wage "to satisfy their [child support] contempt orders and secure their freedom[.]" JA 1837 (citing *Burrell*, 60 F.4th at 47).

*ii. The County obtained no unfair competitive advantage.*

Plaintiffs' argument that the MRF detail resulted in an unfair competitive advantage is largely prefaced on the mere existence of private recyclers, and the fact that the County accepted recyclables for processing at the MRF from a neighboring jurisdiction, Harford County. Plaintiffs' Br. 44-45. Yet, at most, Plaintiffs show that the MRF performed recycling services that are also conducted by private corporations, without any evidence of the "unfair competition" that the FLSA was intended to preempt. *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985). Notably, the County merely sold its recyclables to the highest bidder, and neither considered private recyclers' sales nor sought to "undersell" private recyclers in selling recycled materials sorted at the MRF. JA 481-483. The County also considered the ethical implications of competing with private recyclers, and deliberately avoided expanding its operations into the commercial sector precisely because of such concerns. JA 852-857, JA 86, JA 613.

Moreover, the County was utilizing inmates to perform a recognized government function and fulfill a demand from County residents on their government to "recycle[e] as much capacity as possible."[13] JA 568, JA 582, JA 860. As observed by the District Court below, "[a] governmental advantage from the use

---

[13] 42 U.S.C. § 6901(a)(4) ("[T]he collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies[.]").

of prisoner labor is not the same as a similar low-wage advantage on the part of a private entity: while the latter amounts to an unfair windfall, the former may be seen as simply paying the costs of public goods—including the costs of incarceration." *Vanskike*, 974 F.2d at 811-12. This reasoning is directly on point, as, unlike a private entity whose profits are returned to investors, every dollar of recycling revenue from the MRF was deposited into the County's general fund. JA 552, JA 906, JA 861, JA 1685. These funds then reduced the burden of taxpayers within the County, and paid for a variety of government services, including the operations of the DOC and BCDC, and the minimum standard of living provided to inmates at significant cost to the County. JA 174, JA 552.

While Plaintiffs speculate that the County collected recyclables from Harford County that <u>may</u> have otherwise been collected by a private recycler, *Harker* similarly dealt with the sale of "stationary, letterhead, and similar products" to government entities which would otherwise have to purchase such products from private retailers. *Harker*, 990 F.2d 131. Plaintiffs provide no explanation for why the collection of recyclables from yet another government entity should be treated any differently. This is especially so in the absence of any evidence that the County undercut the market or offered more favorable terms to Harford County than a private recycler because of the availability of inmate workers. *Cf. Watson,* 909 F.2d at 1549 ("construction contractors in the area could not compete with [the defendant

contractor's] prices because they had to pay at least minimum wage for even unskilled labor, not to mention all of the . . . overhead costs avoided by [the defendant].").  In fact, after the suspension of the MRF detail, the County continued its recycling arrangement with Harford County and generated more recycling revenue for the County's general fund than it had during the MRF detail's operations.  *See* p. 15, *supra*.

> ### iii. Plaintiffs ask the Court to intrude on the role of Congress in extending the FLSA to custodial detentions.

Plaintiffs conclude their discussion of the legislative aims of the FLSA with several public policy concerns, such as the necessity for inmate protections under the Occupational Safety and Health Act ("OSHA"), and the "shameful" origins of "convict leasing."  Plaintiffs' Br. 49-50.  However, this Court has observed that it is the province of Congress, rather than the courts, to "expand the FLSA to custodial detentions" in light of such considerations.  *See Ndambi*, 990 F.3d at 375-376.

There is particular reason to adhere to *Ndambi's* preference against "amend[ing] statutes from the bench" in this case, as Plaintiffs and their *amici* recognize that the County is hardly alone in administering inmate work details like the MRF detail.  Congress has further recognized this practice.  For example, inmates of the federal government have worked without a minimum wage for decades to process recyclables sold by Federal Prison Industries, known by its trade name "UNICOR."  Dep't Of Just., A Review of Federal Prison Industries'

ELECTRONIC-WASTE RECYCLING PROGRAM ix, 26 (October 2010), https://oig.justice.gov/reports/BOP/o1010.pdf.  Since 1997, UNICOR has accepted "computers, monitors, printers, and other types of e-waste for recycling[,]" and paid inmates sub-minimum wages to process said recyclables for sale in "international markets" on a much larger scale than the County.[14]  *See* A REVIEW OF FEDERAL PRISON INDUSTRIES' ELECTRONIC-WASTE RECYCLING PROGRAM, *supra*., at 26.

Congress has acknowledged that UNICOR pays sub-minimum wages to inmate workers, and has even considered requiring that UNICOR increase the wages paid to inmates to address the very concerns raised by Plaintiffs here.[15]  Indeed, there is currently legislation pending before Congress to extend the FLSA to custodial work, including the recycling operations of UNICOR.  H.R. 6293, 118th Cong. (2023).  Thus, just as in *Ndambi*, whether inmates should be entitled to the protections of the FLSA as a matter of public policy is best addressed by Congress, which is cognizant of Plaintiffs' public policy concerns.[16]

---

[14] UNICOR's net recycling sales in 2022 were $30,642,000, with $14,972,000 reported as earnings.  UNICOR, ANNUAL MANAGEMENT REPORT FISCAL YEAR 2022 (Nov. 15, 2022), https://www.unicor.gov/publications/reports/FY2022_AnnualMgmtReport.pdf.

[15] H.R. 938, 111th Cong. (2009);  H.R. 2098, 113th Cong. (2013).

[16] Plaintiffs also argue that the concern in *Harker* that "[f]orcing states to pay the minimum wage . . . could well force correctional systems to curtail or terminate these programs" does not apply here because inmates were paid out of the DPW, rather

## <u>CONCLUSION</u>

For the foregoing reasons, the Judgment of the District Court should be AFFIRMED.

Dated: Nov. 20, 2023

Respectfully submitted,

*/s/ Jeffrey T. Johnson*
Jeffrey T. Johnson, Esq.
Kraig B. Long, Esq.
Nelson Mullins Riley & Scarborough, LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
Tel: 443-392-9430
Fax: 443-392-9499
Jeffrey.Johnson@nelsonmullins.com
Kraig. Long@nelsonmullins.com

***Counsel for Appellee***

---

than DOC budget. Plaintiffs' Br. 48-49. Yet, Plaintiffs again overlook that both the DPW and DOC are funded by the County's general fund. JA 174, 552. As explained by the County's Chief of Budget Administration, "the County's money is the County's money[,]" and the financial impact on the County is the same regardless of the agency budget paying inmate workers. JA 172, 461.

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this document contains 12,971 words.

2.     This document complies with complies with the typeface and type style requirements because this document has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


*/s/ Jeffrey T. Johnson*
Jeffrey T. Johnson, Esq.