**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1731

MICHAEL A. SCOTT; RUDOLPH ARMSTRONG; AARON KESSLER; MARK MARINER; LAMAR MARTIN; JEFFREY MATTHEW WELSHONS; DESHAWN PENHA; AARON SILWONUK; ADAM DULAJ; ASZMAR HINES; GREGORY MALICKI; JASON HADEL; MICHAEL WELLS; VINCENT STONE; TONY BLACK; DONNELL FOSTER, JR.; KENNETH NIERWIENSKI, JR.; CHRISTOPHER HACKLEY; EDWARD PENDERGAST; SAIQUON WHITE; JOE MCDANIELS; ESPINAL OSVALDO; YUSEF OSIRUPHU-EL; TAVIST JAMES; DAKOTA BARNARD; MAURICE RICHARDSON; SHAWN BROOKS; RAYNARD STANCIL; JAMES PEACE; CLINTON REAGAN; MATTHEW BAHR; RICHARD LEWIS; KENNETH LUCKEY, JR.; PERRY SENIOR; LAWRENCE ANDERSON; MARK GANTT; RASHAD MILLS; LANDON BUTLER; JEREMY OGAS; GREGORY BLAIR; DAVAUGHN CROSBY; CHRIS VELTE; MATTHEW CARSON; HAROLD SNYDER; BRANDON BUCKMASTER; WILLIAM MOROME; THOMAS WILLIAMS; JOSEPH DAWSON; KEVIN COOPER; DAMIEN WATERS; MATTHEW BERMAN; DUSTIN MOHR,

     Plaintiffs – Appellants,

v.

BALTIMORE COUNTY, MARYLAND,

     Defendant – Appellee.

------------------------------

PUBLIC JUSTICE CENTER; LEGAL AID JUSTICE CENTER; MOUNTAIN STATE JUSTICE; NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF MARYLAND; AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA; AMERICAN CIVIL LIBERTIES UNION OF SOUTH CAROLINA; AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA; AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA; CAUCUS OF AFRICAN AMERICAN LEADERS; MARYLAND CITIZENS UNITED FOR

REHABILITATION OF ERRANTS; FAMILY SUPPORT NETWORK,

Amici Supporting Appellant.

INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION,

Amicus Supporting Appellee.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge. (1:21-cv-00034-SAG)

———————————

Argued: March 19, 2024                    Decided: May 8, 2024

———————————

Before DIAZ, Chief Judge, and HARRIS and HEYTENS, Circuit Judges.

———————————

Vacated and remanded by published opinion. Judge Heytens wrote the opinion, which Chief Judge Diaz and Judge Harris joined.

———————————

**ARGUED:** Howard Benjamin Hoffman, HOFFMAN EMPLOYMENT LAW, LLC, Rockville, Maryland, for Appellants. Jeffrey Thomas Johnson, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Jordan Song En Liew, HOFFMAN EMPLOYMENT LAW, LLC, Rockville, Maryland, for Appellants. Kraig B. Long, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Baltimore, Maryland, for Appellee. Monisha Cherayil, Lucy Zhou, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici Public Justice Center, Legal Aid Justice Center, Mountain State Justice, and National Employment Lawyers Association. Kristi Graunke, Samuel J. Davis, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Sonia Kumar, Deborah A. Jeon, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland; Jennifer Wedekind, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C.; Aubrey Sparks, Nicholas Ward, AMERICAN CIVIL LIBERTIES UNION OF WEST VIRGINIA, Charleston, West Virginia, for Amici American Civil Liberties Union, American Civil Liberties Union of Maryland, American Civil Liberties Union of North Carolina, American Civil Liberties Union of West Virginia, American Civil Liberties Union of South Carolina, American Civil Liberties Union of Virginia, Caucus of African American Leaders, Maryland Cure and Family Support Network. Steven M. Klepper, Christopher C. Jeffries, B. Summer Hughes Niazy, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Amicus International Municipal Lawyers Association.

———————————

2

TOBY HEYTENS, Circuit Judge:

Until 2020, Baltimore County sent incarcerated people from its detention center to work at a facility where the County sorts its recycling. Some of those workers sued the County, alleging violations of the Fair Labor Standards Act and two Maryland statutes. The district court granted summary judgment against the workers, concluding no reasonable adjudicator could view the facts in a way that would make them "employees" under the Act. We vacate the district court's decision and remand for further proceedings.

Courts—including this one—are generally skeptical of Fair Labor Standards Act claims brought by incarcerated workers. But there is no categorical rule that such workers cannot be covered by the Act when they work outside their detention facility's walls and for someone other than their immediate detainer. Having clarified the nature of the required analysis, we remand for a fresh look at the facts under those standards.

I.

A.

Baltimore County operates its own recycling center. The Department of Public Works (DPW) oversees the facility, where residential recycling from throughout the County is sorted. After being separated from non-recyclable waste, recyclable materials are further sorted into bales of "scrap metal, cardboard, mixed paper," "tin," "aluminum," and "four types" of plastic. JA 617. The bales are then sold at auction to "commercial purchasers." JA 479.

During the period at issue, materials were sorted by two types of workers. The first were temporary workers provided by a staffing agency. Those workers were "paid not less

than the statutory minimum wage, as well as overtime compensation for hours worked in excess of forty . . . hours per week." JA 919. The second group of workers—the ones whose status is at issue—came from the Baltimore County Detention Center's community corrections program.

The community corrections unit oversees two related programs: work release and work detail. Detainees participating in work release "are assigned to employment that they had prior to incarceration" or that they secured "through workforce development job sources." JA 706. By contrast, the workers involved here were participating in work detail. In work detail, detainees worked for various other arms of the County, including the County's animal shelter, the County-run Chamber of Commerce, and the County recycling center. Detainees assigned to the recycling center mostly spent their time sorting recycled materials. But unlike the temporary workers, the incarcerated workers were paid $20 per day despite regularly working nine-to-ten-hour shifts.

## B.

Plaintiff Michael Scott worked at the recycling center while serving a short sentence at the detention center. In 2021, Scott filed suit "on behalf of himself and others similarly situated," arguing he was owed "unpaid statutory minimum wages and overtime compensation" for his work, as well as "liquidated and statutory damages." JA 40. The complaint asserts Scott's work at the detention center was covered by the Fair Labor Standards Act and analogous Maryland wage and hour laws.

The district court conditionally certified a collective action to litigate the federal claims and two classes to litigate the state-law claims. After discovery, Scott and the

County filed motions for summary judgment.

The district court granted the County's motion for summary judgment and dismissed Scott's suit. The court concluded that Scott's claims all "fail[ed] as a matter of law" because neither he nor the people he represented were "employees" under the Act or its state law equivalents. JA 1839.

## II.

"Before addressing . . . whether summary judgment was appropriate[,] . . . we must first clarify what facts were properly before the district court." *Motor Club of Am. Ins. v. Hanifi*, 145 F.3d 170, 174 (4th Cir. 1998). In the district court, Scott objected to various pieces of evidence the County relied on when seeking summary judgment. The district court rejected each challenge, and Scott renews a handful of them here. Reviewing each ruling for an abuse of discretion, see *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997), we see no reversible error.

## A.

Scott first asserts the district court relied on "inadmissible lay testimony" when concluding the County operated the work detail program for rehabilitative goals. Scott Br. 52. Scott admits the County submitted affidavits to that effect. But he argues such testimony could not be considered because none of the affiants were "experts in a sociological or psychiatric field" and none conducted or reviewed "any studies or surveys to empirically substantiate the claim" that working at the recycling center reduced recidivism. *Id.*

Scott's arguments fail to convince. Lay witnesses may offer opinion testimony so

long as it is "rationally based on the[ir] . . . perception," "helpful to . . . determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Each official whose affidavit Scott challenges worked for the County and had personal knowledge about the recycling center work detail. From this firsthand experience—and without relying on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c)—the affiants could testify about the County's intentions when assigning incarcerated people to work at the recycling center. Those intentions were also, as we explain further in Section III(B)(3), very much at issue. Cf. *Mutual Life Ins. of N.Y. v. Hillmon*, 145 U.S. 285, 294–95 (1892) (evidence of one's intentions "tend[s]" "to show" one carried out those intentions).

## B.

Scott next objects to the district court's reliance on two letters from community corrections personnel recommending detainees who had previously worked at the recycling center for work release. The County argued those letters were evidence "the work detail program [was] a steppingstone to the work release program," and the district court relied on them for that purpose. JA 1828–29. Scott challenges this ruling, insisting the letters do not qualify as "evidence of" the County's "routine practice" and thus could not be admitted under Federal Rule of Evidence 406. Scott Br. 52–53.

As the district court correctly recognized, however, the County did not need to rely on Rule 406 to admit the letters. That Rule—and its limits—apply only when evidence is offered "to prove that on a particular occasion [a] person or organization acted in accordance with" their "habit or routine practice." Fed. R. Evid. 406. But that is not why

the letters were offered. Instead, they were used to support the claim that the recycling center work detail had a rehabilitative purpose during the relevant period by showing an allegedly rehabilitative outcome for some recycling center workers during that time. See Fed. R. Evid. 401 (evidence is relevant if "it has any tendency to make a fact more or less probable"). And because the evidence was relevant for that purpose, there is no need to consider whether it also would have been relevant for the purpose addressed by Rule 406. See *Huddleston v. United States*, 485 U.S. 681, 687 (1988) ("Rules 404 through 412 . . . [g]enerally . . . do not flatly prohibit the introduction of . . . evidence but instead limit the purpose for which it may be introduced.").

C.

Scott briefly gestures at two more evidentiary challenges we consider forfeited. First, Scott spends one-half of one sentence asserting that a witness the County designated to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6) did so "based on hearsay." Scott Br. 53. Second, Scott asserts—without explanation—that the district court "allowed the introduction of inadmissible evidence" about whether incarcerated workers made a voluntary choice to work at the recycling center. Scott Br. 54.

Neither effort is enough to create an issue for this Court's review. A party seeking to overturn a district court's judgment must do more than list a series of asserted errors or "take[] a passing shot at" a given issue. *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (quotation marks removed). Nor can Scott's reference to the evidentiary objections he made in the district court save him—attempting to "adopt[] by reference" arguments made in the district court is a "practice that has been consistently and roundly

condemned by the Courts of Appeals." *Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 396 n.6 (4th Cir. 1994). Because Scott "failed to develop" these arguments in his opening brief, we will not consider them. *United States v. Robertson*, 68 F.4th 855, 860 n.1 (4th Cir. 2023).

III.

Having "define[d] the relevant pool of evidence," we can now "div[e] into the" merits of the district court's summary judgment decision. *United States v. Gallagher*, 90 F.4th 182, 189 (4th Cir. 2024). "As always, we review the district court's summary judgment ruling de novo, applying the same legal standards as that court." *Harriman v. Associated Indus. Ins.*, 91 F.4th 724, 728 (4th Cir. 2024).

A.

The Fair Labor Standards Act requires "a minimum wage and overtime pay for all covered employees." *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 240 (4th Cir. 2016). This appeal comes down to a single question: Were Scott and other members of the work detail at the recycling center "employees" under the Act?

We begin, as always, with the statutory text. Unfortunately, the Act's "circular definition" of employee—"any individual employed by an employer," 29 U.S.C. § 203(e)(1)—is singularly "unhelpful" when deciding who qualifies for protection. *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 372 (4th Cir. 2021) (quotation marks removed). Lacking better guidance, courts have "look[ed] to the economic realities of the relationship between the worker and the putative employer" in deciding whether a particular worker is a covered employee. *McFeeley*, 825 F.3d at 241 (quotation marks removed). This approach

8

considers the "totality of the circumstances" and is meant to "allow[] for flexible application to the myriad different working relationships that exist in the national economy." *Id.*

Courts have been skeptical of Fair Labor Standards Act claims brought by incarcerated workers, and ours is no exception. In *Harker v. State Use Industries*, 990 F.2d 131 (4th Cir. 1993), this Court refused to apply the Act to "work performed at a prison workshop located within the penal facility." *Id.* at 132. In *Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017), the Court cited "[t]he *Harker* factors" in concluding that a plaintiff who was civilly detained as a sexually dangerous person was not entitled to the federal minimal wage for his "job at FCI Butner." *Id.* at 270, 278. And in *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th. Cir. 2021), the Court relied on *Harker* in rejecting a Fair Labor Standards Act claim brought by immigration detainees for work done "as janitors and in the library and kitchen" at the detention center. *Id.* at 370.

As the district court noted, however, this Court "has yet to analyze" whether the Act applies to "off-site inmate work." JA 1826. And that is exactly what we have here. The recycling center was not "behind prison walls." *Harker*, 990 F.2d at 135. Equally important—it was neither a "prison-operated industry," nor did the recycling center exist to serve "the prison itself." *Id.* This situation thus falls outside *Harker*'s "categorical[]" rule that "work done by inmates behind prison walls for any type of prison-operated industry or for the prison itself" is not covered by the Act. *Id.*

Indeed, the County acknowledges that *some* incarcerated workers fall within the Act's coverage. Recall that detainees participating in work release also leave the County's

9

detention center to perform jobs, before returning to the detention center at the end of the workday. Some workers go to McDonald's, for example. The County agrees those work release participants are "employees," and that McDonald's must pay them the minimum wage and overtime as due under the Act. That concession reflects the commonsense proposition that the "free-world employer[s]" of "work release" participants must "pay [the] minimum wage and otherwise comply with the" Act. *Reimonenq v. Foti*, 72 F.3d 472, 476 (5th Cir. 1996). It also matches *Harker*'s recognition that "extraordinary circumstances" can trigger Fair Labor Standards Act "coverage of inmate labor," 990 F.2d at 135, and our sister circuits' repeated "rejection of a rule that a prisoner's labor is at all times and in all circumstances exempt from the" Act, *Danneskjold v. Hausrath*, 82 F.3d 37, 40 (2d Cir. 1996).[1]

At the same time, we reject Scott's assertion that *Harker*'s entire approach is inapplicable because *Harker* "was never intended to be applied to incarcerated labor performed outside of a prison." Scott Br. 27 (emphasis removed). *Harker* considered the same kind of question we must answer now: Is a worker whose freedom is significantly

---

[1] Accord *Burrell v. Staff*, 60 F.4th 25, 48 (3d Cir. 2023) (incarcerated workers "sufficiently allege that . . . they were employees"); *Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006) ("We have held that prisoners not sentenced to hard labor, who worked outside the jail for a private firm, were FLSA employees of the private firm."); *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (adopting categorical rule akin to this Court's rule in *Harker* without "question[ing] the conclusion[] . . . that prisoners are not categorically excluded from FLSA's coverage simply because they are prisoners"); *Hale v. Arizona*, 993 F.2d 1387, 1389 (9th Cir. 1993) (en banc) ("While we do not believe that prisoners are categorically excluded from the FLSA, we hold that the inmates in this case [are not covered]."); *Henthorn v. Department of Navy*, 29 F.3d 682, 686 (D.C. Cir. 1994) ("[W]here an inmate participates in a non-obligatory work release program in which he is paid by an outside employer, he may be able to state a claim under the FLSA[.]").

curtailed and whose relationship to the national economy is different from the typical worker an "employee" under the Fair Labor Standards Act? As this Court did in *Ndambi*, we follow "the principles of *Harker*" in answering the question before us. 990 F.3d at 373.

B.

Under *Harker*, we consider three "factors" in deciding whether a particular detained worker is covered by the Act. *Matherly*, 859 F.3d at 278. Although *Harker* and *Matherly* discussed the factors in a different order, we arrange them as we do here because it allows us to begin with what looks like our previous cases before turning to what looks different. We start by asking whether the relationship between the workers and their putative employer had the hallmarks of "a true employer-employee relationship." *Harker*, 990 F.2d at 133. We next consider whether the purposes of the Fair Labor Standards Act call for its application. See *id.* at 133–34. Finally, we reach what turns out to be the critical question here: whether the putative employer had "a rehabilitative, rather than pecuniary, interest in" Scott's and his fellow plaintiffs' labor. *Id.* at 133; accord *Matherly*, 859 F.3d at 278 (similar).

1.

This Court has concluded that detainees who "have [the] opportunity" to work "solely at the prerogative of the custodian" "do not deal at arms' length" with their putative employer like the typical worker in the national economy. *Ndambi*, 990 F.3d at 372 (quotation marks removed). Such workers, the Court has explained, "have not made the bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship" and the custodian "wields virtually absolute control over them to a

11

degree simply not found in the free labor situation of true employment." *Harker*, 990 F.2d at 133.

We begin with an important consideration favoring the County. Scott offers a series of reasons why he and his fellow detainees were dealing at arms' length when choosing to work at the recycling center, insisting the work "was optional and voluntary" and noting that the County had to increase pay to motivate incarcerated workers to join the recycling center detail. Scott Br. 11. In *Ndambi*, however, this Court rejected an analogous argument by immigration detainees working in a "voluntary work program." 990 F.3d at 370. "As [the] name suggests," that "program [was] voluntary." *Id.* But because the workers participated "solely at the prerogative of [their] custodian," the Court concluded this factor cut against application of the Act. *Id.* at 372 (quotation marks removed).

True, unlike in *Harker*, *Matherly*, and *Ndambi*, Scott and his fellow workers were not working inside the detention facility or for a "prison-operated industry." *Harker*, 990 F.2d at 135. Perhaps this consideration is not as weighty here, then, as it was in those cases. At the same time, however, Scott and his fellow detainees could only work at the recycling center if approved to do so by Department of Corrections (DOC) staff.

That does not, however, end our inquiry. In contrasting the situation before it with a "true employer-employee relationship," *Harker* emphasized the "virtually absolute control" the state prison exercised over the plaintiffs while they were working in the prison-operated print shop. 990 F.2d at 133. This observation reflects a recurring concern when detainees claim to be employees of their "detainer"—that the detainer exercises "*too much* control" to be understood as a mere employer. *Ndambi*, 990 F.3d at 372 (quotation marks

removed).

Here, by contrast, Scott alleges that someone other than his detainer employed him. As explained more fully below, Scott does not claim he worked at the place he was detained or for a business run by his detainer. Instead, Scott asserts he worked at the recycling center, which was run by DPW. See Part III(B)(3), *infra*. And that, in turn, starts to make this case look more like the typical Fair Labor Standards Act case, where the question is whether the putative employer exercised "*enough*"—rather than too much—control. *Vanskike v. Peters*, 974 F.2d 806, 810 (7th Cir. 1992).

At least when viewed in the light most favorable to the non-moving parties, the evidence suggests that the recycling center exercised the kind of control typical to an employment relationship. Although officers from the detention center were present during work detail shifts, it was recycling center staff—"not . . . [corrections] officer[s]" (JA 975–76)—who assigned the incarcerated workers' workstations, set the work schedule, provided safety and work equipment, and kept attendance records. Such facts are consistent with the level of control exercised by a typical employer. See, *e.g.*, *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 150–51 (4th Cir. 2017) (worker more likely to be employee where putative employer is "daily supervis[or]" and "provide[s] all of the materials, supplies, tools, and equipment" used in work). The County argues that corrections officers also had some supervisory role over work detail participants. But at this stage we must accept Scott's characterization of "unarmed, retired" corrections officers who "spent their time feeding birds as opposed to supervising inmates during bathroom breaks." Scott Br. 41.

A comparison between detainees on work release (who the County admits are employees) and those on work detail (who it insists are not) also confirms this factor does not cleanly favor the County. When a work release participant's shift ends at McDonald's, that person is "not free to walk off the job site and look for other work," nor do they "leave DOC supervision." *Harker*, 990 F.2d at 133. Instead, work release participants are "only allowed to be out of the facility for 12 hours a day" (JA 317), must "travel from [the detention center] to [their] work site and back again by the shortest route and in the least amount of time" (JA 1734), cannot "leave [their] place of employment without permission from designated [corrections] staff" (*id.*), and cannot "change or resign from [their] employment" without "permission from" DOC (*id.*). If DOC's exercise of so much control over detainees who are on work release does not bring such workers outside the Act, it must be because the proper focus of attention is the control exerted by the putative employer. For work release participants, that is a business like McDonald's. For Scott and those he represents, it was DPW. See Part III(B)(3).

To sum up: Because Scott needed DOC's approval to work at the recycling center, he did not bargain at arms' length with his putative employer under this Court's precedent. At the same time, however, there are—at minimum—genuine disputes of material fact that bear on whether Scott's putative employer exercised so much control as to prevent Scott from qualifying as an employee. Especially where "no single factor is dispositive," *McFeeley*, 825 F.3d at 241, this factor alone is not enough to win this case for the County.

2.

We next ask whether the purposes of the Act call for covering workers like Scott.

14

See *Matherly*, 859 F.3d at 278; *Harker*, 990 F.2d at 133–34. Here too, our analysis points in both directions, but this time it tends to favor Scott.

The Fair Labor Standards Act's overriding purpose is to ensure "the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a); see *Harker*, 990 F.2d at 133 (quoting this provision). Scott insists that purpose is implicated here because he and his fellow incarcerated workers needed the Act's protection. As one of Scott's amici notes, "[i]ncarcerated people are forced to purchase food, hygiene, and other items to compensate for grossly inadequate provisions" and must also pay "to maintain family relationships." ACLU Amicus Br. 24–28.

That may well be true, but this Court's precedent forecloses such a theory for why the Act should apply here. Indeed, *Ndambi* rejected an almost identical argument, holding that "any potential inadequacy of conditions is not appropriately remedied by applying the FLSA wholesale to detainees." *Ndambi*, 990 F.3d at 373. If the purposes of the Act call for its application here, it cannot be to benefit Scott and those he represents.

But the Act aims to protect the "general well-being of" *all* workers—not just those seeking coverage in a particular case. 29 U.S.C. § 202(a). It does so by, among other things, "preventing unfair competition in commerce," which happens when employers who "pay the minimum wage" are forced to compete against those who do not. *Harker*, 990 F.2d at 134; see 29 U.S.C. § 202(a)(3). Such competition creates "a general downward pressure on wages" and explains why the Act's strictures must "be applied even to those [workers] who would decline its protections." *Tony & Susan Alamo Found. v. Secretary of Lab.*, 471 U.S. 290, 302 (1985). A worker who would happily labor for free because she is

15

independently wealthy or has the world's best boss cannot opt out of the Act if economic realities reveal she is a covered employee. And this fact, in turn, confirms the Act is concerned not only with the individual workers claiming coverage (here, Scott and those he represents) but also with the effect that the work they do has on other workers and businesses.

Those concerns are directly implicated here, and they set this case apart from those this Court has already considered. As noted previously, the Court's past cases all involved work done by detained people inside their detention facility. See *Harker*, 990 F.2d at 132; *Matherly*, 859 F.3d at 270; *Ndambi*, 990 F.3d at 370. This case, in contrast, involves work done at an offsite location where detained and non-detained workers both worked. That distinction makes a difference.

For one thing, the fact that this work was done outside the prison walls impacts the risk of unfair competition to other businesses. The nature of work done inside a prison constrains its potential impact. Usually, "[t]he opportunity" to do that work "is open only to prisoners." *Danneskjold*, 82 F.3d at 43. Not only is the labor pool limited, but a business seeking to make goods in or provide services from inside a prison must conduct the enterprise within the constraints inherent to the carceral environment. See, *e.g.*, *Sandin v. Conner*, 515 U.S. 472, 484–86 (1995) (describing the "significant amount[] of 'lockdown time'" in prison as an "ordinary incident[] of prison life"). Those realities limit the extent to which output from work done inside prisons can affect commerce outside of prisons.

Not so when you run your operation in the free world but import cheap labor from a prison. As County officials acknowledged, there were "third part[ies] like [W]aste

16

[M]anagement"—a private corporation that does not use incarcerated labor—who "had contracts with many jurisdictions" to provide the same kind of services the County was providing for itself at the recycling center. JA 588. Indeed, the County operated the recycling center "so [it would not] have to go to Waste Management." JA 643. And it could make that choice because it was cheaper for the County to run the recycling center itself than it would have been to use Waste Management. The fact that the County also sorted recycling for two other counties and was trying to secure business from four more only confirms the potential competitive unfairness to private providers.

The County's responses to this point are unpersuasive. For example, the County insists there is no evidence it "sought to 'undersell' private recyclers in selling recycled material." County Br. 49. But even assuming that is true, the County's artificially low labor costs meant it could provide recycling *services* more cheaply than private providers, making it more difficult for private providers to secure business they otherwise might have won. Nor does it help the County's case to argue that operating a recycling center is a "recognized government function." County Br. 49. State and local governments do all sorts of things that might otherwise be "left in private hands" and the Supreme Court long ago jettisoned the view that they are immune from the Fair Labor Standards Act when performing government functions. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546–47 (1985). Instead, the Act applies to "virtually all state and local-government employees." *Id.* at 533.

That brings us to the second reason it matters that this work was done outside the detention facility's walls: It also increased the risk of "unfair competition" for free workers.

17

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 13 (2d Cir. 1984). To be sure, some jobs done inside prisons by incarcerated workers would otherwise be filled by non-incarcerated workers. See, *e.g.*, *Ndambi*, 990 F.3d at 374 (noting that possibility in relation to janitorial, kitchen, library, and barbershop work). But for reasons that echo those discussed above, the possibility of unfair competition is greater—and the Act's overriding purpose more clearly implicated—when incarcerated workers fill jobs outside a detention facility.

That risk was realized here, too. The record contains evidence that the County sought to "get rid of the temp workers" at the recycling center—thereby eliminating what would have been at least minimum wage paying jobs—and thus "decrease costs" by getting "more consistent inmate[] numbers" to do the work instead. JA 927. Perhaps the best proof that the use of incarcerated workers kept other workers from getting these jobs is that after the County stopped using incarcerated workers at the onset of the COVID-19 pandemic (and this lawsuit), it hired more temporary workers for the recycling center and paid them the minimum wage.[2]

---

[2] *Harker* also reasoned that the purposes of the Act did not warrant its application "to work done by inmates behind prison walls for any type of prison-operated industry" because another federal statute—the Ashurst-Sumners Act—"dealt more specifically" with the unfair competition risks posed by "prison-made goods." *Harker*, 990 F.2d at 134–35. Perhaps recognizing that we are not dealing with "prison-made goods," the County's brief barely mentions this aspect of *Harker,* relegating it to a brief reference in a single footnote. See County Br. 46 n.12. One other possible reason for the County's reluctance to emphasize Ashurst-Sumners: if that law applied to the sort of work being done here, the County may have spent years violating it by selling bundles of recycled material produced using incarcerated labor.

18

3.

We arrive now at the last *Harker* factor—whether the "[i]nmates perform work . . . to turn profits for their supposed employer" or instead "as a means of rehabilitation and job training." *Harker*, 990 F.2d at 133; accord *Matherly*, 859 F.3d at 278 (framing the factor in the same way).

We are confronted immediately with a dispute about who Scott's "supposed employer" is and thus whose "interest" in Scott's labor matters. *Harker*, 990 F.2d at 133. The County insists that, legally speaking, there is no such thing as DPW or DOC and thus we must consider the interests of Scott's "custodian"—the County as a whole. County Br. 29, 33. The district court appears to have adopted this view, relying heavily on DOC's goals in sending incarcerated workers to the recycling center in concluding that the Act did not apply. In contrast, Scott asserts that it is DPW's interests in using inmate labor that matter here.

We conclude Scott has the better argument. *First*, Scott's proposed approach is most consistent with *Harker*. In *Harker*, this Court asked whether State Use Industries—an "organization [within the Maryland Department of Corrections] created by the Maryland legislature to meet the rehabilitative needs of inmates"—"ha[d] a rehabilitative, rather than pecuniary, interest in [the plaintiff's] labors." 990 F.2d at 132–33. The Court did not ask whether the facility detaining the plaintiff (or the State of Maryland writ large, of which the facility and prison operated industry were both a part) had such an interest. See *id.* That, in turn, suggests that the relevant question is why DPW was using inmate labor, not why DOC was allowing it to happen.

19

*Second*, treating DPW's interests as the relevant ones fits best with the "uncontroversial" fact that inmates on "work release" are employed by their private employers, not the County. County Br. 28. The County asserts, and the district court concluded, that Scott's claims fail because DOC (or the County via DOC) had a rehabilitative purpose in sending the incarcerated workers to the recycling center. But if that argument is right, it is hard to see why people on work release are covered by the Act. DOC does not allow work release participants to go to McDonald's to make McDonald's more profitable; it does so to "prepare the inmates for reentry into the community." JA 705. If DOC's rehabilitative aim was enough to evade coverage under the Act, work release participants at McDonald's would seemingly not be covered, either.

*Third*, the County's response—that the McDonald's example involves a "third-party employer" but this situation does not, County Br. 28—merely assumes the County is right that the only thing that matters is what legal entity Scott had to name as the defendant in his complaint. That assumption improperly elevates form over substance. "[E]conomic reality rather than technical concepts is to be the test of employment." *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (quotation marks removed).

The Department of Labor's implementing regulations address a similar issue and demonstrate the flaw in the County's argument. One way an employee can show entitlement to a minimum wage is to prove they are "employed in an *enterprise* engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a) (emphasis added). The Department's regulations make clear that an "enterprise is not necessarily coextensive with the entire business activities of an employer" and that "a single employer

20

may operate more than one enterprise." 29 C.F.R. § 779.203; see 29 C.F.R. § 779.204(c) ("In some cases one employer may operate several separate enterprises."). We need not and do not decide whether DPW is a separate enterprise from DOC or any other part of the Baltimore County government. We simply point out that the Act's coverage does not turn on the formal legal label affixed to the putative employer.

*Finally*, the County's "the County is the County is the County" argument offers no persuasive way to distinguish a recent and closely analogous case from the Third Circuit. In *Burrell v. Staff*, 60 F.4th 25 (3d Cir. 2023), that court held civil detainees sent to sort trash at a recycling center had sufficiently alleged they were employees under the Act. See *id.* at 31, 48. The recycling center was run as a "joint public-private venture" by a municipal authority and the "private corporation" to whom the government had "outsource[d]" its recycling operation. *Id.* at 31 (second and third quotes), 45 (first quote).

The County insists that the presence of a "private business[]" in *Burrell* distinguishes it from this case, County Br. 29, but we do not see how we could reject Scott's claim while leaving open the possibility that claims like those in *Burrell* might succeed. For one thing, the County ignores the "public" part of the "public-private venture" in *Burrell*—the court noted the government entity may have been setting the detainees' pay and was receiving an "economic benefit" insofar as it reduced the labor costs the government would have had to otherwise pay. 60 F.4th at 45–46. And even more striking, *Burrell* held the government entity *itself* might be liable as a joint employer. See *id.* at 46.

To be sure, *Burrell* is not quite on all fours, and we would have to follow this Court's precedent even if it required us to reach a result that conflicted with *Burrell*. See *McMellon*

*v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("[O]ne panel cannot overrule another."). But we try to avoid creating circuit splits, and the County identifies no persuasive way to distinguish *Burrell*.

Having determined it is DPW's interest in Scott's employment that matters, we turn to a second legal question: To what extent must DPW have been motivated by rehabilitative aims (rather than economic goals) in deciding to use incarcerated workers? Though it resists saying so directly, the County repeatedly suggests that *any* quantum of genuine rehabilitative purpose takes Scott and his fellow detained workers outside the Fair Labor Standards Act. The district court appears to have adopted that view, stating that even though the "[u]ncontroverted evidence" showed the work release program "served both economic and rehabilitative purposes," it was enough that there was "*some* rehabilitative purpose of the work detail program." JA 1831 (emphasis added). In contrast, Scott argues the appropriate inquiry considers the "primary" purpose during the relevant period. Scott Br. 38.

Here too, we agree with Scott. To begin, none of this Court's previous decisions about detainee labor address this question. In *Matherly*, the Court noted that "there [was] *no* indication that [the plaintiff] [was] working to turn a profit for" his putative employer. 859 F.3d at 278 (emphasis added). And in *Harker*, the Court stated the Act did not apply because the prisoners "perform[ed] work . . . *not* to turn profits for their supposed employer, *but rather* as a means of rehabilitation and job training." 990 F.2d at 133 (emphasis added). The County would have us rewrite that sentence to say that the Act does not apply *even when* inmates "perform work . . . *to* turn profits for their supposed employer,

[*so long as they also do so*] as a means of rehabilitation and job training." Whatever the merits of that rule, it would be an extension of *Harker*, not a mere application of its holding.

True, *Ndambi* holds that the fact that a putative employer is making money—or even is a profit-seeking entity—does not automatically trigger coverage under the Act. See 990 F.3d at 374. But the question here is not why the recycling center exists (which would be the analogous question to the one the Court considered in *Ndambi*): it is why the recycling center was using incarcerated labor and whether any degree of rehabilitative purpose is enough to avoid coverage. And, like *Harker* and *Matherly*, *Ndambi* does not purport to answer that question.

Fortunately, other Fair Labor Standards Act cases have considered the multiple-purposes question. For example, courts have long needed to distinguish between employees and trainees, employees and volunteers, and employees and interns—all situations where the putative employer might have more than one interest at play. To be clear, we do not import the law governing those separate relationships into the prison context wholesale, and we emphasize that here, as elsewhere, we must examine "the particular working relationship, the particular workplace, and the particular industry." *McFeeley*, 825 F.3d at 241. But what is noteworthy is that, in each context, courts apply a "principal" or "primary" purpose analysis. *Isaacson v. Penn Cmty. Servs., Inc.*, 450 F.2d 1306, 1310 (4th Cir. 1971) (first quote) (volunteers); *Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 659 (4th Cir. 2016) (second quote) (trainees); see also *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536 (2d Cir. 2016) (interns). We think the same approach is the right one here.

23

Finally, we emphasize that the time frame that matters is that for which Scott seeks to recover back pay. The record suggests DPW began using incarcerated workers decades in the past, but why it made that choice long ago is not the relevant question. Instead, the question here is whether it had a sufficiently rehabilitative purpose "throughout the relevant period." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 140 (2d Cir. 1999).

To once again sum up: The question under this *Harker* factor is whether DPW's principal or primary purpose for using incarcerated workers at the recycling center during the time frame at issue was for "rehabilitation and job training." *Harker*, 990 F.2d at 133. If the answer is no, this factor cuts strongly in Scott's favor.

C.

The district court, of course, did not have before it our analysis of these issues when it considered the County's motion for summary judgment. For that reason, it is understandable that the court's framing of the relevant legal standards differed from those set out in this opinion in various important respects. True, the de novo standard of review means we could apply those standards ourselves to decide whether to affirm the district court's grant of summary judgment to the County. See *Pendleton v. Jividen*, 96 F.4th 652, 658 (4th Cir. 2024). But "we remain mindful that we are a court of review, not of first view" (*id.* (quotation marks removed)), and we think it better to follow our usual practice of allowing the district court to conduct the required analysis in the first instance. Such an approach seems especially appropriate here given the inherently fact-intensive nature of the relevant inquiry. To be sure, the "*ultimate* conclusion" about whether a given worker is an employee under the Act presents "a legal question." *Schultz v. Capital Int'l Sec., Inc.*,

24

466 F.3d 298, 304 (4th Cir. 2006) (emphasis added). But many of the subsidiary questions that guide that analysis are, unsurprisingly, "factual question[s]." *Tony & Susan Alamo Found.*, 471 U.S. at 299. So while we do not foreclose the possibility of renewed summary judgment proceedings on remand, we emphasize that any factual disputes—including those bearing on the degree of control exercised at the recycling center and DPW's primary purpose in using incarcerated workers—must be viewed in the light most favorable to the non-moving party.

*     *     *

Congress may well not have had workers like Scott in mind when it enacted the Fair Labor Standards Act. "But . . . it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundown Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). And "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (quotation marks removed). These observations ring especially true for this statute—one "whose striking breadth" courts have long recognized. *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 326 (1992).

We reiterate this Court's previous holdings that "work done by inmates behind prison walls for any type of prison-operated industry or for the prison itself" is "categorically" outside the Fair Labor Standards Act. *Harker*, 990 F.2d at 135. We do not hold every incarcerated person who works outside the four walls of their prison is covered by the Act, nor do we hold that every incarcerated person doing a job outside the prison

25

walls that could be done by a free worker at a higher wage is covered. We do not even hold that Scott and those he represents are covered by the Act. Instead, we hold only that the district court applied the wrong legal standards in granting summary judgment to the County here and remand for further proceedings.

The judgment is vacated and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*